UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

| | |
|---|---|
| JOHN POST, Derivatively on Behalf of ROCKWELL MEDICAL, INC., <br><br>                  Plaintiff, <br><br>     v. <br><br> BENJAMIN WOLIN, ROBIN L. SMITH, MARK H. RAVICH, JOHN G. COOPER, LISA N. COLLERAN, ROBERT L. CHIOINI, THOMAS E. KLEMA, PATRICK J. BAGLEY, and RONALD D. BOYD, <br><br>                  Defendants, <br><br>     -and- <br><br> ROCKWELL MEDICAL, INC., a Michigan Corporation, <br><br>               Nominal Defendant. | Case No. <br><br> VERIFIED STOCKHOLDER DERIVATIVE COMPLAINT FOR VIOLATION OF SECURITIES LAW, BREACH OF FIDUCIARY DUTY, WASTE OF CORPORATE ASSETS, AND UNJUST ENRICHMENT <br><br><br><br><br><br><br><br><br><br> <u>DEMAND FOR JURY TRIAL</u> |

Plaintiff, by his attorneys, submits this Verified Stockholder Derivative Complaint for Violation of Securities Law, Breach of Fiduciary Duty, Waste of Corporate Assets, and Unjust Enrichment.  Plaintiff alleges the following on information and belief, except as to the allegations specifically pertaining to plaintiff which are based on personal knowledge.  This complaint is also based on the investigation of plaintiff's counsel, which included, among other things, a review of public filings with the U.S. Securities and Exchange Commission ("SEC") and a review of news reports, press releases, and other publicly available sources.

## <u>NATURE AND SUMMARY OF THE ACTION</u>

1.      This is a stockholder derivative action brought by plaintiff on behalf of nominal defendant Rockwell Medical, Inc. ("Rockwell" or the "Company") against certain of its officers and directors for violation of securities law, breach of fiduciary duty, waste of corporate assets,

and unjust enrichment. These wrongs resulted hundreds of millions dollars in damages to Rockwell's reputation, goodwill, and standing in the business community. Moreover, these actions have exposed Rockwell to hundreds of millions of dollars in potential liability for violations of state and federal law.

2.    Rockwell is a specialty pharmaceutical company that targets end-stage renal and chronic kidney diseases. The Company's principal product is a proprietary drug known as Triferic®. Triferic is an iron maintenance drug with therapeutic qualities that replaces the iron lost by patients during hemodialysis—the most common type of dialysis treatment.

3.    The Company's founder, defendant Robert L. Chioini ("Chioini"), has controlled Rockwell for most of its history. Until his termination in 2018, defendant Chioini was Rockwell's President and Chief Executive Officer ("CEO") and served as a director on the Company's Board of Directors (the "Board"). Defendant Chioini designed Rockwell so that critical information was often only known by him. By Chioini's design, the Board exercised minimal to no oversight, and the Company had ineffective controls on disclosures. Defendant Chioini further cemented his power by appointing officers and directors who would be loyal to him rather than the Company. Defendant Chioini's loyal appointees included defendant Thomas E. Klema ("Klema"), Rockwell's former Chief Financial Officer ("CFO"), as well as former directors defendants Patrick J. Bagley ("Bagley") and Ronald D. Boyd ("Boyd") (collectively, "Chioini & His Loyalists"). In short, Chioini & His Loyalists breached their fiduciary duties and mismanaged Rockwell.

4.    Beginning in early 2016, a stockholder group led by defendant Mark H. Ravich ("Ravich"), David S. Richmond ("Richmond"), and outside investment advisor Richmond Brothers, Inc. ("Richmond Brothers"), fought to overtake Rockwell. These stockholders began to request changes by sending defendant Chioini e-mails, which went largely unanswered.

Eventually, this stockholder group initiated a proxy fight on or around February 2017, seeking to have their nominees added to Rockwell's Board.  Defendant Chioini responded by filing a lawsuit on behalf of Rockwell on March 8, 2017, alleging that this stockholder group failed to make certain required disclosures and misstated other filings with the SEC.

5.     The litigation eventually concluded over a year later on March 7, 2018, when the parties signed the second of two settlement agreements.  As a consequence of the proxy fight and these settlement agreements, defendants Ravich, Lisa N. Colleran ("Colleran"), John G. Cooper ("Cooper"), Robin L. Smith ("Smith"), and Benjamin Wolin ("Wolin") (collectively, the "Dissident Directors") joined Rockwell's Board.  Since then, Rockwell's Board has been plagued by infighting between two groups, with Chioini & His Loyalists on one side, and the Dissident Directors on the other.

6.     Shortly after joining the Board, the Dissident Directors concluded that defendant Chioini was unfit to serve as Rockwell's President and CEO.  They scheduled defendant Chioini's termination for the end of May during a regularly scheduled Board meeting. However, defendant Chioini's termination was moved up by a week upon his presentation of a demand letter containing allegations of breach of fiduciary duty by the Dissident Directors. Defendant Chioini called for a special meeting to discuss the demand letter on May 22, 2018.  Instead of discussing the letter, the Dissident Directors used the opportunity to terminate defendant Chioini in contravention of the Company's Bylaws.  Rockwell announced his termination in a press release on that day.

7.     Defendant Chioini, however, refused to accept his termination and loss of control over Rockwell.  Instead of leaving Rockwell's facility following his termination, defendant Chioini locked himself in his office with defendant Klema.  Defendant Chioini then proceeded to create chaos by issuing a press release and filing a Current Report on Form 8-K with the SEC that publicly

disputed his termination.  As a result of these conflicting press releases, the Nasdaq Stock Market ("NASDAQ") took the unusual measure of halting all trading of Rockwell's stock for two full days. Defendant Wolin ordered defendant Klema to shut down defendant Chioini's computer.  Defendant Klema refused, and consequently was terminated on May 24, 2018.

8.     Then, on June 13, 2018, defendants Chioini and Klema filed a lawsuit against Rockwell and the Dissident Directors for violations of federal whistleblower laws (the "Whistleblower Complaint").  The Whistleblower Complaint contains serious allegations that the Dissident Directors violated their fiduciary duties to the Company.   In particular, the Whistleblower Complaint reveals that one of the Dissident Directors, defendant Smith, instructed an outside consultant with whom she had an undisclosed prior relationship to manipulate his report on executive compensation.

9.     On April 30, 2018, the Director Defendants (as defined herein) issued a materially misleading Proxy Statement (the "2018 Proxy") urging stockholders to vote to approve the 2018 Long Term Incentive Plan (the "2018 LTIP").  The 2018 LTIP would replace the Company's previous equity incentive plan, which expired on April 11, 2017.  The 2018 Proxy represented that the 2018 LTIP was guided by neutral consultants and free from the Board's biases.  In truth, the report forming the basis of the 2018 LTIP was manipulated by a conflicted consultant under defendant Smith's instruction so that director compensation and equity incentives were more favorable.  Stockholders voted to approve the 2018 LTIP, which resulted in overcompensating directors at the Company's expense.

10.     On July 2, 2018, Rockwell filed counterclaims (the "Counterclaims") against defendants Chioini and Klema, and brought in defendants Bagley and Boyd as third-party

defendants. Like the Whistleblower Complaint, the Counterclaims also contain serious allegations that these Board members violated their fiduciary duties to Rockwell.

11. On August 7, 2018, the parties entered into a settlement agreement (the "Whistleblower Settlement Agreement"). As part of the terms of the Whistleblower Settlement Agreement, the parties agreed to mutually release one another from all claims, including various breach of fiduciary duty claims. As a result, the costs of their wrongdoing fell upon Rockwell, which had to pay for various settlement and attorney fees.

12. In addition to the above, Rockwell has been further harmed by the Individual Defendants (as defined herein) making a series of improper statements from November 8, 2017 to June 26, 2018. These improper statements concerned the effectiveness of the Company's internal controls and whether the Company's principal product, Triferic, would obtain a critical approval.

13. Rockwell's financial health was, and still is, dependent on the success and widespread industry adoption of Triferic. The Centers for Medicare & Medicaid Services ("CMS") is the largest payer of healthcare in the United States. Ordinarily, the CMS reimburses dialysis providers for all goods and services used during a standard treatment as part of a bundled payment. Thus, providers lack an incentive to try newer, more expensive drugs such as Triferic. To counteract this disadvantage, the CMS may approve certain promising drugs for separate reimbursement. Because Triferic is a newer and more expensive drug, its marketability is effectively contingent on acquiring separate reimbursement status. From November 8, 2017 to June 26, 2018, the Individual Defendants repeatedly assured the public that Triferic would soon be granted separate reimbursement status. Additionally, the Individual Defendants recklessly built up inventory of Triferic in a bet on separate reimbursement approval, despite Triferic's relatively short shelf life. Unfortunately, the CMS denied Triferic for separate reimbursement, and now the

Company may have to write off much of its inventory due to the drug's expiration.

14.     The Company's fiduciaries knew the CMS rejected Triferic's separate reimbursement application by no later than March 27, 2018, when the CMS sent an e-mail to Rockwell's representative informing Triferic's denial.   Rockwell's management, including defendants Chioini and Klema, were immediately made aware of this e-mail.  However, defendant Chioini failed to share this critical development with the public.  In fact, the Dissident Directors claim that due to defendant Chioini's systematic concealment of Company information, they were not aware of the e-mail until May 21, 2018.  Yet, even after they admittedly learned of the rejection, these Board members failed to file a Current Report on Form 8-K with the SEC disclosing this information.

15.     It was only after the resignation of Rockwell's public auditor, Plante & Moran, PLLC ("Plante & Moran"), that the public learned the truth.  On June 27, 2018, the Company attached Plante & Moran's resignation letter to the announcement, which stated that it had been made aware of the CMS e-mail, and that its contents were inconsistent with the representations Rockwell made to Plante & Moran.  The letter further explained that as a result, Rockwell's Quarterly Report on Form 10-Q for the period ended March 31, 2018 was problematic for various reasons.  In particular, Plante & Moran pointed out that Rockwell's estimated reserve figures failed to account for the CMS's denial, and therefore were understated.  Additionally, the failure to consider this information in calculating the reserve figures indicated that Rockwell did not consider all known facts, and therefore it had a material weakness in its controls over financial reporting.

16.     In the wake of this disclosure, Rockwell's stock plunged more than 33%, or $2.24 per share on June 27, 2018, to close at $4.52 per share compared to the close of $6.76 per share on March 14, 2018, erasing more than $115 million in market capitalization in less than four months.

17.     In addition, a consolidated class action complaint has been filed in the U.S. District Court for the Eastern District of New York against the Company and certain Individual Defendants for violations of the federal securities laws in connection with certain false statements concerning Triferic, estimated reserve figures, and the effectiveness of the Company's internal controls (the "Securities Class Action").  The Securities Class Action is still pending after Judge Allyne R. Ross told defendants that any motion to dismiss would be a waste of time.  On February 18, 2019, defendants filed their answer to the complaint.

18.     On January 22, 2019, plaintiff's counsel sent a stockholder litigation demand letter (the "Demand") to investigate, address, remedy, and commence proceedings against certain of the Company's current and former officers and directors for mismanagement, breaches of fiduciary duties, and violations of securities laws. The Board received the Demand on January 29, 2019. Ninety days have passed without any response.

## JURISDICTION AND VENUE

19.     Pursuant to 28 U.S.C. §1331 and section 27 of the Securities Exchange Act of 1934 (the "Exchange Act"), this Court has jurisdiction over the claims asserted herein for violations of section 14(a) of the Exchange Act and SEC Rule 14a-9 promulgated thereunder.  This Court has supplemental jurisdiction over the remaining claims under 28 U.S.C. §1367.

20.     This Court has jurisdiction over each defendant named herein because each defendant conducts business in this District, or is an individual with sufficient minimum contacts with this District to render the exercise of jurisdiction by the District courts permissible under traditional notions of fair play and substantial justice.

21.     Venue is proper in this Judicial District pursuant to section 27 of the Exchange Act and 28 U.S.C. §1391.  The Company conducts business, and a significant portion of defendants' actions and the damages resulting therefrom occurred, within this District.

22.     In connection with their acts and conducts detailed herein, defendants used the means and instrumentalities of interstate commerce, including but not limited to, the United States mail, interstate telephonic communications and the facilities of the national securities exchange.

## THE PARTIES

**Plaintiff**

23.     Plaintiff John Post was a stockholder of Rockwell at the time of the wrongdoing complained of, has continuously been a stockholder since that time, and is a current Rockwell stockholder.

**Nominal Defendant**

24.     Nominal defendant Rockwell is a Michigan corporation with principal executive offices located at 30142 Wixom Road, Wixom, Michigan.  Rockwell is a specialty pharmaceutical company that develops products for the treatment of iron deficiency, secondary hyperparathyroidism, and hemodialysis for use by patients suffering from end-stage renal disease and chronic kidney disease.  The Company also manufactures hemodialysis concentrates and dialysates for dialysis providers and distributors.  As of December 31, 2018, Rockwell had approximately 269 employees.

**Defendants**

25.     Defendant Wolin is Rockwell's Chairman of the Board and a director and has been since March 2018.  Defendant Wolin was a member of Rockwell's Audit Committee from at least April 2018 to August 2018.  In addition, Defendant Wolin was a member of Rockwell's

Compensation Committee from at least March 2018 to at least August 2018.  Defendant Wolin knowingly or recklessly caused or allowed Rockwell to make improper statements in its press releases, public filings, and 2018 Proxy concerning: (i) Triferic's separate reimbursement potential; (ii) the Company's estimated reserve figures; (iii) the effectiveness of the Company's internal controls; (iv) certifications pursuant to the Sarbanes-Oxley Act of 2002 ("SOX"); and (v) the Company's 2018 LTIP.  Defendant Wolin was named as a defendant in the Whistleblower Complaint, which revealed that he breached his fiduciary duties to the Company.

26.     Defendant Smith is a Rockwell director and has been since June 2016.  Defendant Smith is a member of Rockwell's Governance and Nominating Committee and has been since March 2018.  Defendant Smith was a member of Rockwell's Audit Committee from at least April 2018 to August 2018.  In addition, defendant Smith was a member of Rockwell's Compensation Committee from at least June 2016 to March 12, 2018.  Defendant Smith knowingly or recklessly caused or allowed Rockwell to make improper statements in its press releases, public filings, and 2018 Proxy concerning: (i) Triferic's separate reimbursement potential; (ii) the Company's estimated reserve figures; (iii) the effectiveness of the Company's internal controls; (iv) certifications pursuant to SOX; and (v) the Company's 2018 LTIP.  Defendant Smith was named as a defendant in the Whistleblower Complaint, which revealed that she breached her fiduciary duties to the Company.  Rockwell paid defendant Smith the following compensation as a director:

| Fiscal Year | Fees Earned or Paid in Cash | Restricted Stock Awards | Total |
|---|---|---|---|
| 2017 | $94,140 | $55,860 | $150,000 |

27.     Defendant Ravich is a Rockwell director and has been since June 2017.  Defendant Ravich is a member of Rockwell's Governance and Nominating Committee and has been since March 2018.  Defendant Ravich was a member of Rockwell's Audit Committee in at least March 2018 and at least August 2018.  In addition, defendant Ravich was a member of Rockwell's

Compensation Committee from at least March 2018 to August 2018. Defendant Ravich knowingly or recklessly caused or allowed Rockwell to make improper statements in its press releases, public filings, and 2018 Proxy concerning: (i) Triferic's separate reimbursement potential; (ii) the Company's estimated reserve figures; (iii) the effectiveness of the Company's internal controls; (iv) certifications pursuant to SOX; and (v) the Company's 2018 LTIP. Defendant Ravich was named as a defendant in the Whistleblower Complaint, which revealed that he breached his fiduciary duties to the Company. Rockwell paid defendant Ravich the following compensation as a director:

| Fiscal Year | Fees Earned or Paid in Cash | Total |
|---|---|---|
| 2017 | $87,500 | $87,500 |

28. Defendant Cooper is a Rockwell director and has been since September 2017. Defendant Cooper is a member of Rockwell's Governance and Nominating Committee and has been since March 2018. Defendant Cooper was Chairman of Rockwell's Audit Committee from September 2017 to at least June 2018. Defendant Cooper knowingly or recklessly caused or allowed Rockwell to make improper statements in its press releases, public filings, and 2018 Proxy concerning: (i) Triferic's separate reimbursement potential; (ii) the Company's estimated reserve figures; (iii) the effectiveness of the Company's internal controls; (iv) certifications pursuant to SOX; and (v) the Company's 2018 LTIP. Defendant Cooper was named as a defendant in the Whistleblower Complaint, which revealed that he breached his fiduciary duties to the Company. Rockwell paid defendant Cooper the following compensation as a director:

| Fiscal Year | Fees Earned or Paid in Cash | Stock Appreciation Rights Awards | Total |
|---|---|---|---|
| 2017 | $20,000 | $90,000 | $110,000 |

29.     Defendant Colleran is a Rockwell director and has been since March 2018. Defendant Colleran is a member of Rockwell's Governance and Nominating Committee and has been since March 2018.   Defendant Colleran was a member of Rockwell's Compensation Committee from at least March 2018 to at least August 2018. Defendant Colleran knowingly or recklessly caused or allowed Rockwell to make improper statements in its press releases, public filings, and 2018 Proxy concerning: (i) Triferic's separate reimbursement potential; (ii) the Company's estimated reserve figures; (iii) the effectiveness of the Company's internal controls; (iv) certifications pursuant to SOX; and (v) the Company's 2018 LTIP.  Defendant Colleran was named as a defendant in the Whistleblower Complaint, which revealed that she breached her fiduciary duties to the Company.

30.     Defendant Chioini founded Rockwell in October 1996 and was the Company's President and CEO from February 1997 to May 2018; Chairman of the Board from March 2000 to March 2018; and a director from October 1996 to August 2018.  Defendant Chioini founded Rockwell's predecessor company in January 1995 and was the predecessor company's President from January 1995 to February 1997.  Defendant Chioini is named as a defendant in the Securities Class Action complaint that alleges he violated sections 10(b) and 20(a) of the Exchange Act. Defendant Chioini knowingly, recklessly, or with gross negligence made improper statements in Rockwell's    press    releases,    public    filings,    and    2018    Proxy    concerning: (i) Triferic's separate reimbursement potential; (ii) the Company's estimated reserve figures; (iii) the effectiveness of the Company's internal controls; (iv) certifications pursuant to SOX; and (v) the Company's 2018 LTIP.   Rockwell named defendant Chioini as a defendant to its Counterclaims, which alleged that he violated his fiduciary duties to the Company.  Defendant Chioini caused the Company to release him from any and all claims through the date of the

Whistleblower Settlement Agreement on August 7, 2018.  Rockwell paid defendant Chioini the following compensation as an executive:

| Year | Salary | Stock Awards | All Other Compensation | Total |
|------|--------|--------------|------------------------|-------|
| 2017 | $898,439 | $1,396,500 | $7,200 | $2,302,139 |

31.     Defendant Klema was Rockwell's CFO, Treasurer, Secretary, and Vice President from January 1999 to May 2018.  Defendant Klema is named as a defendant in the Securities Class Action complaint that alleges he violated sections 10(b) and 20(a) of the Exchange Act.  Defendant Klema knowingly, recklessly, or with gross negligence made improper statements in Rockwell's press releases and public filings concerning: (i) Triferic's separate reimbursement potential; (ii) the Company's estimated reserve figures; (iii) the effectiveness of the Company's internal controls; and (iv) certifications pursuant to SOX.  Rockwell named defendant Klema as a defendant to its Counterclaims, which alleged that he violated his fiduciary duties to the Company.  Defendant Klema caused the Company to release him from any and all claims through the date of the Whistleblower Settlement Agreement on August 7, 2018.  Rockwell paid defendant Klema the following compensation as an executive:

| Year | Salary | Bonus | Stock Awards | Total |
|------|--------|-------|--------------|-------|
| 2017 | $442,007 | $88,401 | $391,020 | $921,428 |

32.     Defendant Bagley was Rockwell's Lead Independent Director from at least March 2017 to March 2018, and a director from July 2005 to June 2018.  Defendant Bagley was a member of Rockwell's Audit Committee from at least April 2017 to March 2018.  Defendant Bagley was also a member of Rockwell's Compensation Committee from at least April 2014 to March 12, 2018.  Defendant Bagley knowingly or recklessly caused or allowed Rockwell to make improper statements in its press releases, public filings, and 2018 Proxy concerning: (i) Triferic's separate reimbursement potential; (ii) the Company's estimated reserve figures; (iii) the effectiveness of the

Company's internal controls; (iv) certifications pursuant to SOX; and (v) the Company's 2018 LTIP.  Rockwell named defendant Bagley as a defendant to its Counterclaims, which alleged that he violated his fiduciary duties to the Company.  Defendant Bagley caused the Company to release him from any and all claims through the date of the Whistleblower Settlement Agreement on August 7, 2018.  Rockwell paid defendant Bagley the following compensation as a director:

| Fiscal Year | Fees Earned or Paid in Cash | Restricted Stock Awards | Total |
|---|---|---|---|
| 2017 | $94,140 | $55,860 | $150,000 |

33.    Defendant Boyd was a Rockwell director from March 2000 to August 2018. Defendant Boyd was a member of Rockwell's Audit Committee from at least April 2017 to July 2018.  Defendant Boyd was also a member of Rockwell's Compensation Committee from at least April 2014 to March, 12 2018.  Defendant Boyd knowingly or recklessly caused or allowed Rockwell to make improper statements in its press releases, public filings, and 2018 Proxy concerning: (i) Triferic's separate reimbursement potential; (ii) the Company's estimated reserve figures; (iii) the effectiveness of the Company's internal controls;  (iv) certifications pursuant to SOX; and (v) the Company's 2018 LTIP.  Rockwell named defendant Boyd as a defendant to its Counterclaims, which alleged that he violated his fiduciary duties to the Company.  Defendant Boyd caused the Company to release him from any and all claims through the date of the Whistleblower Settlement Agreement on August 7, 2018.  Rockwell paid defendant Boyd the following compensation as a director:

| Fiscal Year | Fees Earned or Paid in Cash | Restricted Stock Awards | Total |
|---|---|---|---|
| 2017 | $94,140 | $55,860 | $150,000 |

34.    The defendants identified in ¶¶30-31 are herein referred to as the "Officer Defendants."  The defendants identified in ¶¶25-30, 32-33 are herein referred to as the "Director Defendants."  The defendants identified in ¶¶25-28, 32-33 are referred to herein as the "Audit

Committee Defendants."  The defendants identified in ¶¶25-27, 29, 32-33 are referred to herein as the "Compensation Committee Defendants."  The defendants identified in ¶¶26-29 are referred to herein as the "Governance and Nominating Committee Defendants."  Collectively, the defendants identified in ¶¶25-33 are referred to herein as the "Individual Defendants."

## DUTIES OF THE INDIVIDUAL DEFENDANTS

**Fiduciary Duties**

35.    By reason of their positions as officers and directors of the Company, each of the Individual Defendants owed and owe Rockwell and its stockholders fiduciary obligations of trust, loyalty, good faith, and due care, and were and are required to use their utmost ability to control and manage Rockwell in a fair, just, honest, and equitable manner.  The Individual Defendants were and are required to act in furtherance of the best interests of Rockwell and not in furtherance of their personal interest or benefit.

36.    To discharge their duties, the officers and directors of Rockwell were required to exercise reasonable and prudent supervision over the management, policies, practices, and controls of the financial affairs of the Company.  By virtue of such duties, the officers and directors of Rockwell were required to, among other things:

(a)    ensure that the Company was operated in a diligent, honest, and prudent manner in compliance with the Company's Bylaws and all applicable laws, rules, and regulations;

(b)    conduct the affairs of the Company in an efficient, business-like manner in compliance with all applicable laws, rules, and regulations so as to make it possible to provide the highest quality performance of its business, to avoid wasting the Company's assets, and to maximize the value of the Company's stock;

(c) remain informed as to how Rockwell conducted its operations, and, upon receipt of notice or information of imprudent or unsound conditions or practices, make reasonable inquiry in connection therewith, and take steps to correct such conditions or practices and make such disclosures as necessary to comply with applicable laws;

(d) establish and maintain systematic and accurate records and reports of the business and internal affairs of Rockwell, and procedures for the reporting of the business and internal affairs to the Board and to periodically investigate, or cause independent investigation to be made of, said reports and records;

(e) maintain and implement an adequate and functional system of internal legal, financial, and management controls, such that Rockwell would comply with all applicable laws, and Rockwell's financial statements and regulatory filings filed with the SEC and disseminated to the public and the Company's stockholders would be accurate; and

(f) truthfully and accurately guide investors and analysts as to the business operations of the Company at any given time.

**Additional Duties of the Audit Committee Defendants**

37. Under Rockwell's Audit Committee Charter, the Audit Committee Defendants, defendants Wolin, Smith, Ravich, Cooper, Bagley, and Boyd, owed specific additional duties to Rockwell. According to the Audit Committee Charter, among other things, the Audit Committee is responsible for assisting the Board in fulfilling its oversight responsibilities with respect to "(i) the annual financial information to be provided to shareholders and the [SEC]; (ii) the system of internal controls that management has established; (iii) the external audit process; and (iv) the determination of the independent auditor's qualifications and independence." Additionally, the Audit Committee Charter provides that the Committee "should have a clear understanding with

the independent accountants that they must maintain an open and transparent relationship with the Committee, and that the ultimate accountability of the independent accountants is to the Board and the Committee. Additionally, the Audit Committee is required to make regular reports to the Board concerning its activities. In fulfilling its oversight responsibilities, the Audit Committee is required to:

6.2    In consultation with the independent auditors and management, monitor the adequacy of the Company's internal controls.

6.3    Be responsible for the appointment, compensation, oversight and retention of the registered public accounting firm engaged (including resolution of disagreements between management and the auditor regarding financial reporting) for the purpose of preparing or issuing an audit report or performing other audit, review or attest services of the Company. Each such registered public accounting firm will report directly to the Committee.

6.4    Review with the independent auditors their audit procedures, including the scope, staffing, locations, reliance upon management, fees and timing of the audit, and the results of the annual audit examination and any accompanying management letters, and any reports of the independent auditors with respect to interim periods.

6.5    Ensure the receipt of, and review, the written statement from the independent auditors of the Company concerning any relationships between the auditors and the Company or any other relationships that may adversely affect the independence of the auditors as required under Independent Standards Board Standard No. 1, and regularly assessing the independence of the auditors by actively engaging in a dialogue with the independent auditors with respect to any disclosed relationships or services that may impact the objectivity or independence of the auditors and for taking, or recommending that the full Board take, appropriate action to oversee the independence of the auditors.

6.6    Review with independent auditors and management the quarterly financial information to be included in the Company's Form 10-QSB reports.

6.7    At the completion of the annual audit, review with management and the independent accountants the following:

(A)    Other communications as required to be communicated by the independent accountants by Statement of Auditing Standards (SAS) 61, as it may be modified or amended. These discussions should

include the independent auditors' judgments about the quality of the Company's accounting principles, applications and practices as applied in its financial reporting, including such matters as the consistency of application of the Company's accounting policies, the clarity, consistency and completeness of the Company's accounting information contained in the financial statements and related disclosures, and items that have a significant impact on the representational faithfulness, verifiability, neutrality and consistency of the accounting information included in the financial statements.

(B)     If deemed appropriate after such review and discussion, approve and recommend to the Board that the financial statements be included in the Company's annual report on Form 10-KSB.

6.8     Report annually to the shareholders, describing the Committee's composition, responsibilities and how they were discharged and any other information required by applicable rules and regulations, including approval of non-audit services.

6.9     Establish policies and procedures for the review and approval by the Committee of all auditing services and permissible non-audit services (including the fees and terms thereof) to be performed by the independent auditors.

6.10     Review significant accounting and reporting issues, including recent professional and regulatory pronouncements, and understand the impact on the Company's financial statements.

6.11     Review any material pending legal proceedings involving the Company and other contingent liabilities.

6.12     Oversee compliance with Company's Code of Business Conduct and Ethics, including review of system for confidential, anonymous submission by employees of concerns regarding questionable accounting or auditing matters and review of procedures for the receipt, retention and treatment of complaints received by the Company regarding accounting, internal accounting controls or auditing matters.

6.13     Review and approve on an ongoing basis all related party transactions required to be disclosed pursuant to Item 404 of SEC Regulation S-B.

6.14     Engage independent counsel and other advisors as the Committee determines necessary to carry out its duties.

6.15    Determine the appropriate funding for payment of the auditors, Committee counsel and advisors and other ordinary administrative expenses of the Committee that are necessary or appropriate in carrying out the duties of the Committee.

**Additional Duties of the Compensation Committee Defendants**

38.    Under Rockwell's Compensation Committee Charter, the Compensation Committee Defendants, defendants Wolin, Ravich, Smith, Colleran, Bagley, and Boyd, owed specific additional duties to Rockwell.   According to Rockwell's Compensation Committee Charter, among other things, the Compensation Committee is responsible for "overseeing, reviewing, assessing, and recommending or approving all compensation benefits for executive officers and making recommendations to the full [Board] with regard to director compensation." The Compensation Committee is also responsible for reviewing "the compensation discussion and analysis section of Rockwell's annual meeting proxy statement and to produce a report to be included in Rockwell's annual meeting proxy statement." Additionally, the Compensation Committee is responsible for the following:

**Compensation Strategy**. The Committee is responsible for, in conjunction with the full Board, overseeing and making recommendations with regard to overall compensation strategy. Such strategies shall seek to accomplish the goals described in Section II of this Charter.

*        *        *

**Compensation Policies and Programs**. The Committee shall oversee the development and implementation of Rockwell's compensation policies and programs, including making recommendations and determinations with respect to, approving and administering Rockwell's compensation and employee benefit plans, discharging any responsibilities imposed on the Committee by such plans and approving plan documents for stock or cash bonus plans, equity-based plans and grants thereunder, non-employee director stock plans and other executive and director compensation arrangements. The Committee may also review other employee compensation and benefit programs as directed by the Board from time to time and may approve on behalf of the Board, or recommend to the full Board for approval, such programs to the extent Board action is necessary or appropriate.

**Chief Executive Officer Evaluation**. The Committee shall annually review Rockwell's strategic business plan at the end of each year and shall meet in an executive session to evaluate the performance of the Chief Executive Officer in meeting the objectives stated in that plan. The Committee shall communicate its evaluation to the Chief Executive Officer.

**Compensation of Executive Officers**. The Committee shall review and approve the compensation of the Chief Executive Officer and the other executive officers. Approvals and/or recommendations may be made with regard to (i) the total compensation package (including base salary, bonus, long-term stock incentives, employment agreements, severance arrangements, change-in-control agreements, and other forms of compensation), (ii) the structure and award formulae and calculation and performance targets for all incentive compensation programs for all executive officers, and (iii) how such incentive compensation programs compare to peer companies and how they relate to Rockwell's performance when compared to such peer companies. The Chief Executive Officer shall not be present during voting or deliberations with respect to the review and approval of Chief Executive Officer compensation.

**Director Compensation**. The Committee is responsible for making recommendations to the Board with respect to director compensation and for making and approving the terms of grants to directors under Rockwell's equity-based plans.

### VI. Reporting

The Committee shall review and discuss with the management of Rockwell the compensation discussion and analysis section of the annual meeting proxy statement, prepare and/or approve the compensation committee report on such section to be included in Rockwell's annual meeting proxy statement and review other proxy statement compensation disclosure. In addition, the Committee shall keep minutes of each meeting held and report to the Board regarding each meeting. This report shall include a review of any recommendations or issues that arise with respect to executive compensation and any other matters that the Committee deems appropriate or that the Board requests be included. The chairperson may also report at Board meetings on Committee matters as requested.

**Additional Duties of the Governance and Nominating Committee Defendants**

39.     Under Rockwell's Governance and Nominating Committee Charter, the Governance and Nominating Committee Defendants, defendants Smith, Ravich, Cooper, and Colleran owed specific additional duties to Rockwell.  According to Rockwell's Governance and Nominating Committee Charter, among other things, the Governance and Nominating Committee

is responsible for director selection, composition, and evaluation.  Specifically, the Governance

and Nominating Committee is responsible for the following:

- Identify individuals believed to be qualified as candidates to serve on the Board of Directors and recommend that the Board of Directors select the candidates for all directorships to be filled by the Board of Directors or by the shareholders at a shareholders meeting. In identifying candidates for membership on the Board of Directors, the Committee shall take into account all factors it considers appropriate, which may include (a) ensuring that the Board of Directors, as a whole, is diverse and consists of individuals with various and relevant career and professional experience, relevant technical skills, industry knowledge and experience, financial expertise (including expertise that could qualify a director as a "financial expert," as that term is defined by the rules of the Securities and Exchange Commission), local or community ties and (b) appropriate individual qualifications, including strength of character, mature judgment, familiarity with the Company's business and industry, independence of thought and an ability to work collegially. With respect to diversity, the Committee should also consider such factors as differences of viewpoint, education, skill, and other individual qualities and attributes that contribute to board heterogeneity, including characteristics such as race, gender and national origin. The Committee is committed to seeking highly qualified candidates inclusive of all national origins, races and genders to include in the pool from which director nominees are chosen. The Committee also may consider the extent to which the candidate would fill a present need on the Board of Directors.

- Develop and recommend to the full Board of Directors standards to be applied in making determinations as to the absence of material relationships between the Company and a director.

- Review and make recommendations to the full Board of Directors, or determine, whether members of the Board of Directors should stand for re-election, including matters relating to the retirement of members of the Board of Directors, term limits and age limits.

*       *       *

- Evaluate candidates for nomination to the Board of Directors, including those recommended by shareholders. In that regard, the Committee shall evaluate candidates submitted by shareholders in the same manner and based on the same criteria as candidates submitted by the Board of Directors.

- Conduct all necessary and appropriate inquiries into the backgrounds and qualifications of possible candidates.

- Consider questions of independence and possible conflicts of interest of members of and candidates for the Board of Directors, and whether a candidate has special interests or a specific agenda that would impair his or her ability to effectively represent the interests of all shareholders.

**Breaches of Duties**

40.     Each Individual Defendant, by virtue of his or her position as an officer and/or director, owes and/or owed the Company the fiduciary duty of loyalty and good faith and the exercise of due care and diligence in the management and administration of the affairs of the Company.  The conduct of the Individual Defendants complained of herein involves a knowing and culpable violation of their obligations as officers and directors of Rockwell, the absence of good faith on their part, and a reckless disregard for their duties to the Company that the Individual Defendants were aware or reckless in not being aware posed a risk of serious injury to the Company.

41.     The Individual Defendants also breached their duty of loyalty and good faith by allowing defendants to cause, or by themselves causing, the Company to enter into the Whistleblower Settlement Agreement that forced Rockwell to take on the costs of their breaches of fiduciary duties while at the same time releasing themselves from liability. These improper practices wasted the Company's assets, and caused Rockwell to incur substantial damage.

42.     The Individual Defendants breached their duty of loyalty and good faith by allowing defendants to cause, or by themselves causing, the Company to misrepresent Triferic's separate reimbursement potential, estimated reserve figures, and internal controls.  These improper practices wasted the Company's assets, and caused Rockwell to incur substantial damage.

43.     The Individual Defendants, because of their positions of control and authority as

officers and/or directors of Rockwell, were able to and did, directly or indirectly, exercise control over the wrongful acts complained of herein.  The Individual Defendants also failed to prevent the other Individual Defendants from taking such illegal actions.  As a result, and in addition to the damage the Company has already incurred, Rockwell has expended, and will continue to expend, significant sums of money.

### CONSPIRACY, AIDING AND ABETTING, AND CONCERTED ACTION

44.     In committing the wrongful acts alleged herein, the Individual Defendants have pursued, or joined in the pursuit of, a common course of conduct, and have acted in concert with and conspired with one another in furtherance of their common plan or design.  In addition to the wrongful conduct herein alleged as giving rise to primary liability, the Individual Defendants further aided and abetted and/or assisted each other in breaching their respective duties.

45.     During all times relevant hereto, the Individual Defendants, collectively and individually, initiated a course of conduct that was designed to and did: (i) deceive the investing public, including stockholders of Rockwell, as to Triferic's separate reimbursement potential and the effectiveness of the Company's internal controls; (ii) force Rockwell and the Individual Defendants to enter into the self-dealing Whistleblower Settlement Agreement; and (iii) enhance the Individual Defendants' executive and directorial positions at Rockwell and the profits, power, and prestige that the Individual Defendants enjoyed as a result of holding these positions.  In furtherance of this plan, conspiracy, and course of conduct, the Individual Defendants, collectively and individually, took the actions set forth herein.

46.     The Individual Defendants engaged in a conspiracy, common enterprise, and/or common course of conduct.  During this time, the Individual Defendants caused the Company to issue improper financial statements.

47.     The purpose and effect of the Individual Defendants' conspiracy, common enterprise, and/or common course of conduct was, among other things, to disguise the Individual Defendants' violations of securities law, breaches of fiduciary duty, waste of corporate assets, and unjust enrichment; and to conceal adverse information concerning the Company's operations, financial condition, and future business prospects.

48.     The Individual Defendants accomplished their conspiracy, common enterprise, and/or common course of conduct by causing the Company to purposefully or recklessly release improper statements.  Because the actions described herein occurred under the authority of the Board, each of the Individual Defendants was a direct, necessary, and substantial participant in the conspiracy, common enterprise, and/or common course of conduct complained of herein.

49.     Each of the Individual Defendants aided and abetted and rendered substantial assistance in the wrongs complained of herein.  In taking such actions to substantially assist the commission of the wrongdoing complained of herein, each Individual Defendant acted with knowledge of the primary wrongdoing, substantially assisted in the accomplishment of that wrongdoing, and was aware of his or her overall contribution to and furtherance of the wrongdoing.

## FACTUAL BACKGROUND AND OVERVIEW

50.     Rockwell is a specialty pharmaceutical company that develops products for patients with end-stage renal and chronic kidney diseases.  The Company's principal product is a proprietary drug known as Triferic.

51.     Triferic is an iron maintenance therapy provided to patients who suffer iron loss as a result of hemodialysis, a form of dialysis treatment.  Hemodialysis is needed by patients with kidneys that no longer serve to remove enough waste from their blood.  During hemodialysis, a patient's blood is cleaned through the use of a dialysis machine and special filter known as an

artificial kidney, or a "dialyzer."  The dialysis machine pumps a solution known as dialysate through the dialyzer that is comprised of two parts separated by a thin membrane.  While the patient's blood is pumped through this thin membrane, dialysate flows in the opposite direction.

52.     A common side effect of dialysis in chronic patients is anemia, or iron deficiency. The human body needs iron; however, free iron is toxic and can potentially result in death.  Thus, for safe transportation into the body, iron must be bound to a protective shell known as a ligand. Triferic binds iron to pyrophosphate, an ideal ligand.  Triferic supposedly has clinical benefits over current iron replacement treatments because it is administered via dialysate directly to bone marrow in a manner that avoids iron storage in the liver.  This is critical for patients with liver damage.

53.     Since Triferic is the Company's principal product, the financial health of Rockwell was, and is, dependent on the success and widespread industry adoption of the drug. The U.S. Food and Drug Administration ("FDA") approved Triferic for commercial sales in January of 2015. Despite Triferic's FDA approval and clinical benefits, however, the drug's widespread industry adoption is complicated by the CMS.  As the single-largest payer of healthcare in the United States, the CMS is able to influence the success of new drugs through the rate of reimbursement it offers physicians.  Since 2015, Rockwell has sought to increase the level of CMS reimbursement for Triferic to encourage greater industry adoption.

54.     Under section 1881(b)(14) of the Social Security Act, the CMS pays a bundled reimbursement for all products, goods, and services provided during a standard dialysis treatment, including the cost of drugs.  Because the CMS does not provide reimbursement for individual drugs, treatment providers are not incentivized to purchase clinically superior drugs at a greater

cost.  As a result, drug companies often find it difficult to compete with established and more affordable drugs.

55.     To counteract this disadvantage, the CMS created a formal pathway for innovative therapies to receive separate or transitional payment status.  This is known as the Transitional Drug Add-on Payment Adjustment (codified at 42 C.F.R. §413.234(c)), which provides for a separate reimbursement to physicians for the use of selected drugs for a period of time.   Separate reimbursement status incentivizes providers to use clinically superior drugs and enables drugs to gain traction in the market based on their medical efficacy as opposed their cost.  Acquiring separate reimbursement status for Triferic would have been a significant financial benefit to Rockwell.

56.     Since Triferic obtained FDA approval in 2015, investors have been hopeful that Rockwell's fiduciaries would soon be able to effectively market the drug by obtaining separate reimbursement status.  As it awaits wide-spread industry adoption, Rockwell has experienced continued losses.  Rockwell's annual net losses for the years 2018, 2017, 2016, 2015, and 2014 were $32.1 million, $25.9 million, $19.8 million, $14.4 million, and $21.3 million, respectively.

57.     Unfortunately, Rockwell has been unable to receive separate reimbursement for Triferic.  On March 27, 2018, the CMS sent an e-mail to Rockwell's representative rejecting Triferic for separate reimbursement.  Defendants, however, failed inform the public of this critical development.  Instead, they repeatedly made misstatements between November 8, 2017 and June 26, 2018, concerning the high likelihood of Triferic obtaining separate reimbursement status and the likelihood of Rockwell's ability to secure approval under the Transitional Drug Add-on Payment Adjustment.  Defendants also made misstatements concerning the effectiveness of the Company's internal controls.

58.     When the truth came out, Rockwell's market capitalization plunged by 33%, or $2.24 per share on June 27, 2018, to close at $4.52 per share compared to the close of $6.76 per share on March 14, 2018, erasing more than $115 million in market capitalization in less than four months.  Investors filed the Securities Class Action against the Company and defendants Chioini and Klema for violations of the federal securities laws.  The Securities Class Action is still pending after Judge Allyne R. Ross told defendants that "it is virtually inconceivable to me that the consolidated amended complaint could possibly be dismissed on a Rule 12(b)(6) motion or Rule 9(b) motion."

59.     In addition to the above, Rockwell has been plagued by infighting and litigation between two groups of its fiduciaries.  These groups are Chioini & His Loyalists, defendants Chioini, Klema, Bagley, and Boyd, on the one side, and the Dissident Directors, defendants Wolin, Smith, Ravich, Cooper, and Colleran, on the other side.  On May 22, 2018, the Dissident Directors terminated defendant Chioini.  Two days later, on May 24, 2018, they terminated defendant Klema.

60.     On June 13, 2018, defendants Chioini and Klema jointly filed the Whistleblower Complaint against Rockwell and the Dissident Directors for violations of the federal whistleblower laws.  On July 2, 2018, Rockwell responded to the Whistleblower Complaint by filing the Counterclaims against Chioini & His Loyalists.  Both the Whistleblower Complaint and the Counterclaims detail a litany of wrongdoings by Rockwell's fiduciaries.  Among other things, both sides accuse one another of a lack of loyalty to Rockwell, incompliance to the Company's Bylaws, excessive compensation, and nondisclosure of material information.

61.     On August 7, 2018, the parties to the Whistleblower Complaint and the Counterclaims entered into the Whistleblower Settlement Agreement.  As part of the terms of the

Whistleblower Settlement Agreement, the parties agreed to mutually release one another from all claims, and also agreed that Rockwell would pay $1.5 million to Chioini & His Loyalists.

62.     The Individual Defendants' conduct devastated Rockwell, as evidenced by the 63%, or $221 million erasure in its market capitalization from March 14, 2018 to December 31, 2018.

## THE INDIVIDUAL DEFENDANTS REPEATEDLY
## BREACH THEIR FIDUCIARY DUTIES

**Rockwell's Failed Governance Under Defendant Chioini**

63.     Defendant Chioini took the Company public in 1998. He secured his power at Rockwell by serving as both the CEO and Chairman of the Board for most of Rockwell's history. In addition, instead of appointing Board members based on their qualifications, defendant Chioini chose inexperienced individuals who would value their loyalty to him over their loyalty to Rockwell or its stockholders as Company directors.  His loyal directors included defendant Boyd, Chioini's friend from college, who was appointed in 2000, and defendant Bagley, a personal injury attorney, who Chioini appointed in 2005, after he filed and dismissed a lawsuit on Rockwell's behalf.  Defendant Chioini also chose defendant Klema to serve as his right-hand man and Rockwell's CFO beginning in 1999.

64.     Defendant Chioini also established staggered stockholder director elections in order to prevent large portions of his loyal Board from being replaced at any one time.  Moreover, before 2018, there were always six or fewer members of the Board, with defendants Chioini, Bagley, and Boyd holding three of the seats.  Because Rockwell requires a majority approval for Board resolutions, these defendants could unilaterally enact or veto Board action.

65.     As was subsequently revealed in litigation between Rockwell and defendants Chioini and Klema, Chioini & His Loyalists breached their fiduciary duties for decades by disregarding their oversight responsibilities and legal obligations.  Rockwell rarely held Board

meetings.  When the members of the Board did meet, defendant Chioini would call the meetings without proper notice or no notice at all.  These meetings were basically used to ratify defendant Chioini's own unilateral actions.   Specifically, defendant Chioini would enter into material transactions on Rockwell's behalf either without prior Board approval or without notifying the Board at all.

66.     Defendant Chioini also discouraged the sharing of information and kept the Company in informational and organizational "silos" in order to prevent any challenges to his power.  When the Dissident Directors joined the Board, defendant Chioini prevented their access to key data and instructed management to not speak to them without first obtaining his clearance on whether to speak to them or what to say.  Consequently, internal controls on disclosures and misconduct were defective.

67.     Additionally, as Rockwell admitted, there was not a formal business plan until the Dissident Directors joined the Board years later.  The Company explained in the Counterclaims that "[t]o the extent that Rockwell had any long-term strategic plan or annual business plan under Chioini, it was completely in his (and potentially Klema's) mind."  As a result of these structural failures and the severely informal governance, Rockwell pointed out the Company received "F" ratings for corporate governance by industry analysts every year from 2013 to 2016.

**Rockwell's Counterclaims Reveal that Defendants Chioini, Klema, Bagley, and Boyd Breached Their Fiduciary Duties by Wrongfully Enriching Themselves at Rockwell's Expense**

68.     In addition to the failed governance under defendant Chioini, Rockwell's Counterclaims revealed that Chioini & His Loyalists breached their fiduciary duties to Rockwell by granting themselves unwarranted executive compensation. The lack of oversight and resounding loyalty between these defendants enabled them to grant themselves exorbitant

executive compensation while Rockwell experienced continued losses and underperformed its peers in the biopharmaceutical industry.  During Rockwell's financial decline from 2012 to 2018, defendants Boyd and Bagley (both of whom sat on the Compensation Committee) approved granting defendant Chioini over $25 million in compensation.  According to Rockwell, defendant Chioini was compensated at rates five times more than what a similarly-situated CEO would make. In 2014 and 2015, defendant Chioini's annual compensation was $8.5 million and $7.8 million, respectively.  Also, between the years 2014 and 2015, defendants Bagley and Boyd granted themselves almost $700,000 in stock awards and stock options.  This compensation was excessive and to the detriment of Rockwell and its stockholders.

**Defendants Chioini, Klema, Bagley, and Boyd Interfered with Investigations into Their Wrongful Conduct**

69.     As exposed by Rockwell's Counterclaims, Chioini & His Loyalists violated their fiduciary duties to the Company by interfering with investigations into their wrongful conduct and disregarding conflicts of interest to suit their own needs.

70.     On January 8, 2015, Rockwell received a stockholder demand (the "2015 Demand") to investigate and take legal action against the Board for granting themselves improper equity awards in violation of the Company's 2007 Long Term Incentive Plan ("2007 LTIP").[1]  The 2015 Demand explains the Board unlawfully granted themselves and other executives 825,000 stock options. These stock options were "spring-loaded," or granted immediately prior to the Company's announcement of positive news so that they would instantly become valuable.  In addition, the 2015 Demand explains the Board granted defendant Chioini equity awards that exceeded the limits of the stockholder-approved 2007 LTIP.  At the time, Rockwell's Board comprised of only four

---

[1] The Company's 2007 LTIP expired on April 11, 2017.

directors, defendants Chioini, Bagley, and Boyd as well as former director Kenneth Holt ("Holt"). Realizing their conflicted status and inability to investigate the 2015 Demand, Chioini & His Loyalists petitioned the Oakland County Court to appoint S. Thomas Wienner ("Wienner") as the disinterested investigator.[2]  Rockwell claims David Potts, an attorney also engaged by Chioini & His Loyalists, assisted Wienner in his investigation.  Based this tainted investigation, Wienner concluded that although granting themselves these stock options may have constituted a breach of fiduciary duty, he believed there was little chance of prevailing on the claim.

71.    Then, in 2016, the Board received another stockholder demand letter (the "2016 Demand") alleging that Holt and defendants Chioini, Klema, Bagley, and Boyd breached their fiduciary duties by concealing and misrepresenting information regarding Triferic and Rockwell's financial statements.  Again, these conflicted defendants petitioned the Oakland County Circuit Court to appoint Wienner to oversee this investigation. The Judge refused, concluding that Wienner was conflicted due to his previous investigation.  They then sought to appoint another preferred attorney, Robert Carson.  The Judge again refused and instead appointed an unaffiliated third party.  Rather than allow the unaffiliated third party to oversee the investigation, the defendants simply moved to dismiss their petition. Instead, Holt and defendants Bagley and Boyd created a new committee, the "Demand Committee," to investigate themselves.  Even though the Judge rejected his appointment, the Demand Committee engaged Robert Carson as "independent legal counsel to advise and assist" the 2016 Demand's investigation.  The investigation concluded

_____

[2] Pursuant to section 450.1495(2)(c) of Michigan's Business Corporation Act, corporations may petition the court to appoint a disinterested individual to investigate stockholder demand claims and determine whether derivative litigation is in the company's best interest.

in 2018 and resulted in defendants Bagley and Boyd deciding against pursuing legal action against themselves.

**A Stockholder Group Led by Richmond and Defendant Ravich Attempt to Exert Their Control over Rockwell**

72.     In early 2016, a stockholder group led by Richmond and defendant Ravich began efforts to take control over Rockwell.  Richmond owns and operates Richmond Brothers, an outside investment group.  Holding over 10% of the Company's common stock, Richmond Brothers and its affiliates were, and still and still are, the largest beneficial owner of Rockwell. Defendant Ravich began accumulating Rockwell's common stock prior to his election to the Board, and together with Richmond Brothers, held more than 11% of Company stock.  After seeking the support of other stockholders, Richmond and defendant Ravich began pressuring defendant Chioini to implement changes.  On February 4, 2016, the stockholder group sent an e-mail to defendant Chioini with a list of recommendations, including that the Company: (i) reconstitute or expand the Board; (ii) implement a best practices policy into Rockwell's governance programs; (iii) add more management depth; and (iv) provide a five-year plan for the commercialization of Triferic. Although their demands for the most part went unanswered, the Board decided to expand from four to five with the appointment of defendant Smith in June 2016.  This, however, was not enough to appease Richmond or defendant Ravich.

73.     On March 2, 2017, Richmond and defendant Ravich initiated a proxy contest by nominating themselves as Board candidates at the 2017 Annual Meeting of Shareholders. Defendant Chioini quickly responded by filing a lawsuit on March 8, 2017, on behalf of Rockwell against Richmond, defendant Ravich, and certain Rockwell stockholders (the "Rockwell/Richmond Lawsuit").  The Rockwell/Richmond Lawsuit claimed that the defendants

violated section 13(d) of the Exchange Act by failing to make certain required disclosures and misstating other filings with the SEC.

74.     While the Richmond/Rockwell Lawsuit was still pending, defendant Ravich was elected to the Board over Rockwell's nominee by nearly two-thirds of the stockholders' vote on June 1, 2017.   At the time of defendant Ravich's election, there were only five directors on Rockwell's Board: defendants Chioini, Bagley, Boyd, and Smith, and Holt (who did not stand for reelection).   Despite being a Board member, defendant Chioini repeatedly declined defendant Ravich's formal requests for corporate records and deliberately excluded him from Board meetings.   On September 7, 2017, while the Rockwell/Richmond Lawsuit was still pending, Rockwell expanded its Board to six in order to meet NASDAQ audit requirements with the addition of defendant Cooper.   Thus, the Board was comprised of defendants Chioini, Boyd, and Bagley on one side, and the newly appointed Board members on the other, defendants Smith, Ravich, and Cooper.

**Defendant Cooper Breached His Fiduciary Duties to Rockwell by Disclosing Material, Nonpublic Information to Further His Self-Interests**

75.     On November 22, 2017, Rockwell and Richmond entered into the first settlement agreement to the Rockwell/Richmond Lawsuit (the "First Settlement Agreement").   The First Settlement Agreement provided for, among other things: (i) an $895,000 reimbursement by Rockwell to the stockholder group (comprised in part by Richmond and defendant Ravich) for litigation and proxy contest expenses; (ii) the addition of one director by February 15, 2018, but if the Board did not add the director by that date, the stockholder group would be permitted to nominate directors; (iii) the elevation of either defendant Cooper or the new Board member to the position of Lead Independent Director in place of defendant Bagley; and (iv) the obligation of Richmond and defendant Ravich to "not, directly or indirectly, in any manner, alone or in concert

with others," take certain actions, including: "consciously work in parallel, or otherwise participate in a joint activity or course of action, with any person (other than the Company or any of its officers or directors) toward acquiring control or otherwise exercising a controlling influence over the and policies of the Company, whether or not pursuant to an express agreement."

76.     The Whistleblower Complaint reveals the First Settlement Agreement's terms reflected an undisclosed agreement between Richmond and defendant Cooper, who breached his fiduciary duties to Rockwell by engaging in self-dealing and disclosing unauthorized information to Richmond.   While negotiating the settlement's terms, Richmond conspired with newly-appointed defendant Cooper to secure both reimbursement and expanded Board control.   In exchange, defendant Cooper would receive increased compensation by virtue of his elevated Board position as Lead Independent Director.   In addition, defendant Cooper wanted his friend, defendant Colleran, on the Board.   To meet their respective interests, defendant Cooper provided Richmond with material, nonpublic information regarding potential litigation Rockwell faced with respect to the Company's intellectual property.   Richmond then leveraged this information against defendants Chioini, Bagley, and Boyd and pressured them into accepting the First Settlement Agreement's terms, which were previously construed by Richmond and defendant Cooper in secret.   Richmond and defendant Cooper achieved their desires, as the First Settlement Agreement reveals.   However, as later revealed, the First Settlement Agreement had shortcomings and was unfavorable to Rockwell.   Thus, rather than act in the best interests of the Company in negotiating settlement terms, defendant Cooper instead sought to benefit himself.

**The Whistleblower Complaint Reveals that Certain Defendants Breached Their Fiduciary Duties to Rockwell by Disclosing Material, Nonpublic Information and Manipulating Board Composition to Further Self-Interests**

77.     Under the terms of the Richmond/Rockwell Lawsuit's First Settlement Agreement, Richmond and defendant Ravich were able to revive their proxy fight if Board failed to appoint a

director by the February 15, 2018 deadline.  The Board knew it was in the Company's best interest to meet this deadline.  If not, the Company ran the risk of another costly proxy fight ensuing at the 2018 Annual Meeting of Shareholders.  The threat of this proxy fight would give Richmond and defendant Ravich ammunition to renegotiate the First Settlement Agreement on more favorable terms.  Additionally, Rockwell's $895,000 payment to Richmond and defendant Ravich would essentially become waste.  However, rather than acting in Rockwell's best interests and appointing a qualified director by the deadline, the Dissident Directors instead manipulated the director appointment process to further their own interests.

78.     According to the Whistleblower Complaint, defendants Ravich, Cooper, and Smith conspired with Richmond to recruit new Board members that were predisposed to Richmond's self-enriching scheme.  They also secretly agreed to vote against any other candidate, however qualified, that was brought forth by defendants Chioini, Bagley, and Boyd.  In disguise of her true intentions, defendant Smith suggested that the Board employ a recruiter, Jodi Emery ("Emery"), to search for candidates.  Emery is the founding partner of Ignite Search Partners ("Ignite").  Although defendant Smith and Emery had a prior relationship, defendant Smith represented to the Board that they had never met before.  As a result of the prior relationship, defendant Smith exercised influence over Emery.  To manipulate the Board's process of evaluating and selecting a new director, defendant Smith instructed Emery to submit negative reviews on candidates that lacked the approval of Richmond and defendants Smith, Cooper, and Ravich. Inversely, she instructed Emery to recommend candidates that were predisposed to act loyally to defendants Smith, Cooper, and Ravich.

79.     Defendant Smith's intention to enrich herself and the other directors is evidenced by her selected nominee, George Bickerstaff ("Bickerstaff").  Though the Board was receiving

$60,000 in annual compensation at that time, Bickerstaff demanded that he receive $250,000. Defendant Smith preferred Bickerstaff because if he was appointed, his required compensation could be used as a justification to increase the compensation of all directors.  Defendant Smith and Emery also aided Bickerstaff to misstate the compensation he received from service on other corporate boards.  Additionally, Emery failed to disclose she was conflicted in recommending his candidacy, as Bickerstaff was one of Emery's personal friends who had also previously sat on the advisory board at Ignite, Emery's company.  Although defendants Ravich and Cooper continued to support Bickerstaff even after learning about these misstatements, defendant Smith withdrew her recommendation after realizing that a majority approval would be impossible, since defendants Chioini, Bagley, and Boyd would not support his candidacy.

80.  Defendant Smith then proposed Elena Kogan ("Kogan"), who had no prior experience serving on a public company's board, and who also had an undisclosed prior relationship with Emery.  Though a majority vote seemed out of the question, the Board attempted to compromise by allowing Kogan's appointment, but only if another candidate, AJ Nassar ("Nassar"), was added as well.  With the addition of two Board members, the plan to control Rockwell's Board would go awry.  Although Kogan initially accepted, defendant Smith convinced Kogan to rescind her acceptance and tell the Board that she would only accept the offer if Nassar was not also included.  Defendant Smith also instructed Emery to submit negative reviews on Nassar, who was preferred by defendants Chioini, Bagley, and Boyd.  As a result of this improper interference, the Board failed to appoint a director by February 15, 2018 deadline, and Richmond and defendant Ravich were able to reengage their fight for control of the Company.

81.  With defendants Chioini, Bagley, and Boyd threatened by the prospect of a second proxy fight, Richmond and defendants Smith, Cooper, and Ravich were able to negotiate a second

settlement agreement on terms even more favorable to them (the "Second Settlement Agreement"). The Second Settlement Agreement was entered into on March 7, 2018, and provided for, among other things: (i) an additional payment of $428,000 to Richmond; (ii) the addition of defendants Colleran and Wolin to the Board (both of whom were presented as independent); and (iii) the requirement that defendant Bagley not stand for reelection.  While negotiating the Second Settlement Agreement, defendants Smith, Cooper, and Ravich conspired with Richmond to formulate an agreement that would enable them to take control of the Board and obtain higher compensation for themselves.

82.     In addition, defendants Colleran and Wolin (both of whom joined the Board pursuant to the Second Settlement Agreement's terms), failed to disclose the existence of prior relationships before their appointments. Defendant Wolin failed to disclose his previous employment on the advisory board of Emery's company, and defendant Colleran failed to disclose her previous employment as a consultant for defendant Cooper's company.  The failure to disclose this information ensured that defendants Colleran and Wolin would be appointed, thereby expanding Richmond and defendant Ravich's Board influence and opportunities for self-enrichment.

**Certain Defendants Manipulated Executive Compensation Reports and Voted to Approve Excessive Compensation**

83.     As exposed by the Whistleblower Complaint, the Dissident Directors violated their fiduciary duties of loyalty and care to Rockwell by manipulating an outside consultant into issuing an altered compensation report, and using the then manipulated report to vote in favor of increased compensation.

84.     As part of the Second Settlement Agreement, Richmond and defendant Ravich agreed to vote in favor of the 2018 LTIP.  Thereafter, the Dissident Directors secretly agreed to

remove defendant Boyd as Chairman of the Compensation Committee and replace him with defendant Ravich.  Then, on April 17, 2018, Rockwell filed with the SEC a Current Report on Form 8-K announcing an amendment to the Second Settlement Agreement that provided for a vote in favor of a *revised* 2018 LTIP.

85.     According to the Whistleblower Complaint, this revised 2018 LTIP was manipulated by John Markson ("Markson"), an executive compensation consultant referred to the Board by defendant Smith. Under defendant Smith's instruction, Markson manipulated his analysis of Board compensation so that his recommendation to the Board reflected higher pay than previous analyses.  He accomplished this by including peer firms with significantly higher market capitalization so that it would seem as though "peer" executives were receiving higher compensation than truly comparable executives actually were.  The manipulated 2018 LTIP increased director pay by approximately 275% over their 2017 pay, or 50% over the previous compensation analysis conducted by a neutral compensation consultant.  According to defendants Chioini and Klema, this was 178% over the peer compensation analysis report conducted by the independent advisory firm, Institutional Shareholder Services (which the Individual Defendants were aware of).  Based on the manipulated report, the Dissident Directors voted to approve a dramatic increase in annual compensation—from approximately $81,000 to approximately $225,000.  The vote was made without following Rockwell's Bylaws and with insufficient notice to defendants Chioini, Bagley, and Boyd.

86.     In addition to increased compensation, the revised 2018 LTIP also purported to create stock options for nonexistent stock that could only by created by stockholder vote.  The revised director stock options are more valuable than prior equity plans, since all vesting would occur within the first twelve months.  Under prior plans, vesting occurred at a rate of one-third per

year over the course of three years.  The revised 2018 LTIP was approved without following Bylaws, as there was neither a meeting of the Compensation Committee nor a full Board discussion.

87.     In addition to enriching themselves at Rockwell's expense, the Individual Defendants' failure to disclose these alterations may have caused the Company to violate federal securities laws in further violation of their fiduciary duties to Rockwell.

**The Dissident Directors Violated Their Fiduciary Duties by Terminating Defendant Chioini Without Following Bylaws**

88.     According to defendants Chioini and Klema, on May 21, 2018, they received a stockholder demand letter containing serious allegations of wrongdoing and breaches of fiduciary duties by defendants Wolin, Ravich, Smith, and Colleran.  Pursuant to Rockwell's Bylaws, defendant Chioini sent an e-mail to the Board notifying everyone that there would be a telephonic emergency meeting to discuss the demand letter later that evening.  Although all of the directors accepted the calendar invitation for the meeting that was attached to the e-mail, the Dissident Directors failed to join the call.  Thereafter, defendants Chioini and Klema called for another special meeting to take place the following day, on May 22, 2018.

89.     At some point prior to the May 22, 2018 special meeting, the Dissident Directors held a secret meeting without notice to defendants Chioini, Bagley, and Boyd.  According to defendants Chioini and Klema, these directors sought to "hijack" the meeting and terminate defendant Chioini.  According to Rockwell, however, the Dissident Directors had concluded by April 2018, that defendant Chioini was unfit to serve as CEO and decided that he would be terminated at a regularly scheduled meeting on May 30, 2018.

90.     Nevertheless, the Dissident Directors used the occasion to expedite defendant Chioini's termination at the special meeting.  After connecting to the call and taking roll, defendant

Chioini began to discuss the stockholder demand letter.  However, he was quickly cut off by defendant Wolin, who immediately made a motion to terminate defendant Chioini.  Over defendant Chioini's objection, defendant Wolin proceeded with the motion and the Dissident Directors voted to terminate defendant Chioini.  Immediately thereafter, the five Dissident Directors disconnected.  This motion was in contravention of Rockwell's Bylaws and regular orders.  The meeting was called for the specific purpose of discussing the stockholder demand letter and there was no discussion permitted on the content of the motion.  Moreover, defendants Bagley and Boyd were not permitted to speak, and though defendant Bagley was allowed to vote, defendant Boyd was not.

**Defendants Chioini and Klema Are Ousted, but Continued to Damage Rockwell by Resisting Their Terminations**

91.     The Company filed with the SEC a Current Report on form 8-K and issues a press release announcing defendant Chioini's termination on May 22, 2018.  On that same day, defendant Chioini made a public spectacle by locking himself in his office with defendant Klema and filing with the SEC a Current Report on Form 8-K.  In the Form 8-K, defendant Chioini publicly disputed his termination and maintained that he was still CEO.  On May 23, 2018, as a result of this chaos and the conflicting press release and Forms 8-K, NASDAQ halted all trading of Rockwell's stock for two days.

92.     Defendant Wolin ordered defendant Klema, who remained CFO at the time, to shut down defendant Chioini's computer while they were locked inside his office, warning him that failure to do so could result in termination for cause.  Defendant Klema did not do as ordered and, as a result, he was terminated for cause.  Following these actions, Rockwell filed suit seeking a declaration that defendants Chioini and Klema must accept their terminations (the "Declaratory

Relief Lawsuit"). On May 25, 2018, the parties entered into a Stipulated Order, which prohibited defendants Chioini and Klema from contacting any of Rockwell's employees for twenty-one days.

93.     Defendants Chioini and Klema proceeded to violate the Stipulated Order by contacting defendants Bagley and Boyd and instructing them to perform certain actions. Specifically, defendants Bagley and Boyd were ordered to prevent Rockwell's preservation of defendants Chioini's and Klema's electronic records, "despite the fact that the Company had obligations to do so in light of the shareholder demand letter, this litigation, the SEC whistle blower complaint, and the SEC Inquiry." Defendant Bagley actively encouraged Rockwell's employees to prevent the preservation and collection of electronic records, even though the Company reminded him that he needed to comply with his legal obligations.  Additionally, Rockwell further explained that defendants Bagley and Boyd took possession of the only keys to defendants Chioini's and Klema's offices and forbade anyone from entering.

94.     Defendants Chioini and Klema also attempted to destroy electronic evidence that was relevant to an ongoing SEC inquiry.  After engaging a forensic electronic discovery specialist, Rockwell discovered that defendants Chioini and Klema deleted thousands of e-mails in breach of their fiduciary duties and legal obligations to preserve records.

95.     Defendants Bagley and Boyd also hired counsel for themselves at Rockwell's expense in contravention of a Board resolution prohibiting them from incurring costs without prior Board approval.  One of these firms, Dickinson Wright PLLC, required a retainer of $250,000.

96.     Meanwhile, on June 13, 2018, defendants Chioini and Klema filed the Whistleblower Complaint seeking reinstatement of their positions.

97.     As part of the Stipulated Order discussed above, the Individual Defendants were required to participate in mediation.  As a result of the mediation, on June 20, 2018, Rockwell and

defendants Chioini, Klema, Bagley, and Boyd executed an agreement term sheet (the "June Term Sheet"). The June Term Sheet provided that, among other things: (i) defendants Chioini and Klema were prohibited from holding themselves out as Rockwell officers or taking any actions on behalf of Rockwell; (ii) defendant Bagley will resign from the Board effective June 21, 2018; (iii) defendant Chioini will remain a Board member; and (iv) the signatories must stipulate to its entry. In a sudden about-face, defendants Bagley and Boyd refused to stipulate to its entry, despite the fact that the June Term Sheet was a binding contract, and despite the fact that they were still fiduciaries. Thereafter, also in breach of the June Term Sheet, defendants Chioini and Klema filed a motion to set aside the June Term Sheet and appoint a receiver to run Rockwell. At this point in time, defendant Chioini's fiduciary duties remained intact. Thus, defendant Chioini further breached his fiduciary duties to Rockwell by refusing to abide to the June Term Sheet. Due to this conduct, on July 17, 2018, Rockwell voluntarily dismissed the Declaratory Relief Lawsuit. Rockwell filed the Counterclaims against Chioini & His Loyalists on July 2, 2018 in response to the Whistleblower Complaint.

**The Individual Defendants Cause Rockwell to Enter into the Whistleblower Settlement Agreement Mutually Releasing One Another from All Claims at Rockwell's Expense**

98.     The Whistleblower Complaint filed by defendants Chioini and Klema and the Counterclaims filed by Rockwell ultimately resulted in a settlement on August 7, 2018. Rockwell and the Individual Defendants signed the Whistleblower Settlement Agreement, and most of its terms were filed with the SEC on a Current Report on Form 8-K that day. The Whistleblower Settlement Agreement provides that defendants Chioini and Boyd "resigned" from the Board on the agreement's execution date and thus, their fiduciary duties to the Company remained intact until August 7, 2018. The Whistleblower Settlement Agreement also provides for the mutual

release of all claims between Rockwell and defendants Chioini, Klema, Bagley, and Boyd. Specifically, the Form 8-K discussing the Whistleblower Settlement Agreement stated:

> On August 7, 2018, Rockwell Medical, Inc., a Michigan corporation (the "Company") together with Benjamin Wolin ("Wolin"), Mark Ravich ("Ravich"), John Cooper ("Cooper"), Robin Smith ("Smith") and Lisa Colleran ("Colleran") (Wolin, Ravich, Cooper, Smith, and Colleran are collectively referred to as the "Other Directors") entered into a confidential settlement agreement and mutual release with Robert L. Chioini ("Chioini"), Thomas E. Klema ("Klema"), Patrick J. Bagley ("Bagley") and Ronald D. Boyd ("Boyd", together with Chioini, Klema and Bagley, the "Settling Parties") (the "Settlement Agreement"). The Settlement Agreement, which was entered into pursuant to that certain settlement term sheet, dated July 30, 2018, provided, among other things, that:
>
> • Chioini and Boyd resigned from the Company's Board of Directors (the "Board");
>
> • The Settling Parties, the Company (including certain of its affiliates and representatives), and the Other Directors mutually release one another from any and all claims through the date of the Settlement Agreement;
>
> • The Settling Parties and the Company will cause the federal lawsuit filed against the Company and the Other Directors, and the Company's counterclaims against the Settling Parties, in the Eastern District of Michigan to be dismissed with prejudice and without cost to any party thereto;

By mutually releasing the claims against one another, the Individual Defendants caused Rockwell to forfeit valuable breach of fiduciary duty claims against defendants Chioini, Klema, Bagley, and Boyd, at a minimum.

99.     In addition to allowing defendants Chioini, Klema, Bagley, and Boyd to escape liability from their breaches of fiduciary duties, the Individual Defendants also forced Rockwell to take on the costs of their wrongdoings. Specifically, Rockwell was required to pay an aggregate $1.5 million to defendants Chioini, Klema, Bagley, and Boyd, as well as an additional $30,000 to defendant Boyd. The Form 8-K stated:

> • The Company will pay to the Settling Parties an aggregate payment of $1.5 million, $750,000 of which was paid upon the execution of the Settlement

Agreement.  The remaining $750,000 will be paid in nine monthly installments of $83,333 each, with the last installment being paid in May 2019.  The Company will also pay Boyd an additional $30,000 upon his execution of the Settlement Agreement.

The Company's Quarterly Report filed on Form 10-Q with the SEC on November 9, 2018, discloses the Whistleblower Settlement Agreement's full terms.  The Whistleblower Settlement Agreement attached to the Form 10-Q explains how the $1.5 million payment is to be allocated between these defendants, explaining:

> **Division of Payments**. Chioini, Klema, Bagley, and Boyd will determine amongst themselves how to allocate the payments … between themselves (with the exception of the $30,000 payment to be made directly to Boyd).  Rockwell shall have no responsibility or liability with respect to any such allocation.

100.    The Individual Defendants caused Rockwell to accelerate the vesting of defendants Chioini's and Klema's unvested Company stock options, which were scheduled to vest through October 2, 2018.  The November 9, 2018 Form 10-Q explained:

> In accordance with the original terms of their employment agreements of [Chioini] and [Klema] and in accordance with the terms of the Settlement Agreement…, the Company accelerated the vesting of 258,334 and 71,667 unvested stock options on the termination date.  As a result of this acceleration of stock options, the Company recorded additional stock-based compensation of approximately $162,000.

101.    Rockwell claims defendants Chioini and Klema were terminated for cause.  According to defendants Chioini's and Klema's employment agreements with Rockwell, termination for cause results in the Company owing them nothing other than unpaid compensation.  Defendant Chioini's and Klema's employment agreements—attached to the Company's Current Report on Form 8-K filed with the SEC on March 13, 2018—explain:

> In the event of a termination of Executive's employment by the Company for Cause, without Good Reason, … Executive shall be entitled to any unpaid compensation accrued through the last day of the Executive's employment.... Executive shall not be entitled to receive any other compensation or benefits from the Company whatsoever.

Had the Individual Defendants maintained Rockwell's claim that defendants Chioini and Klema were terminated for cause, they would not have been entitled to any additional compensation, including the $1.5 million and the acceleration of any unvested shares.

102.     Thus, not only did defendants Chioini, Klema, Bagley, and Boyd manage to get away with breaching their fiduciary duties, but they also managed to negotiate a transaction whereby Rockwell would actually compensate them.  Rather than continuing to pursue Rockwell's claims against defendants Chioini, Klema, Bagley, and Boyd, the Individual Defendants instead forced Rockwell to take on the costs of their wrongdoing, resulting in an unjustified payment of $1.5 million and the unwarranted acceleration of defendants Chioini's and Klema's unvested shares.

## THE INDIVIDUAL DEFENDANTS' BREACHES OF DUTY RESULT IN A SERIES OF IMPROPER STATEMENTS

103.     In the midst of this ongoing drama between, between November 8, 2017 and May 10, 2018, the Individual Defendants made or allowed the Company to make a series of improper statements in press releases, filings with the SEC, and during conference calls.  These improper statements concerned: (i) Triferic's separate reimbursement potential; (ii) the Company's estimated reserve figures; (iii) the effectiveness of the Company's internal controls; and (iv) certifications pursuant to SOX.

104.     The CMS approving Triferic for separate reimbursement was, and still is, critical to Rockwell's financial health.  "Until the add-on reimbursement status issue is resolved for Triferic, we do not anticipate realizing significant revenues from it," the Company stated in its Quarterly Report on Form 10-Q filed with the SEC on May 9, 2017.  The Individual Defendants repeatedly assured the public that this critical development would soon materialize.  "[W]e believe

that Triferic will receive separate reimbursement" the Company stated in its Quarterly Reports on Forms 10-Q for the first, second, and third quarters of 2017.

105.    In pursuing Triferic's separate reimbursement, Rockwell employed Steven Stranne ("Stranne") to lobby on its behalf with the CMS.  On March 24, 2018, Stranne followed up Triferic's application for separate reimbursement in an e-mail to the CMS's Chief Medical Officer, Dr. Anand Shah.  On March 27, 2018, Dr. Shah e-mailed Stranne back informing that the CMS rejected Triferic.  The e-mail stated: "We have carefully reviewed your concept and submitted materials. Unfortunately, given the other initiatives CMS has underway, we will not be able to pursue this model."  Stranne, who frequently communicated between the CMS and Rockwell, forwarded the e-mail to Rockwell's management, including defendants Chioini and Klema. Defendants Chioini and Klema, however, failed to share this critical development with the public. The Dissident Directors claim they did not discover the e-mail's existence until May 21, 2018, the day before defendant Chioini's termination.  Still, even after they admittedly learned of the rejection, these Board members also failed to disclose this information to the public.

106.    On May 7, 2018, defendant Chioini asked Stranne in an e-mail to review his notes for the May 10, 2018 call with investors.  Although the CMS rejected Triferic, defendant Chioini wanted to tell the public, "[r]egarding the timing for receiving an approval from CMS…, we are hopeful that we will hear from them sometime in this second quarter."  On May 8, 2018, Stranne replied to defendant Chioini and advised caution in an e-mail stating, "be sensitive to how this might sound if read by people at CMS like Dr. Shah.  CMS said 'no'."

107.    Despite their undisclosed knowledge of the CMS's unequivocal denial, the Individual Defendants continued to create an expectation that the CMS would soon approve Triferic.

**Improper Statements Concerning Triferic's Separate Reimbursement Potential and Estimated Reserve Figures**

108.    From November 8, 2017 to May 10, 2018, Rockwell's statements about the high likelihood of Triferic obtaining separate reimbursement status and its estimated reserve figures were improper.  These statements were improper when made because they failed to disclose and misrepresented the following material, adverse facts, which the Individual Defendants knew, consciously disregarded, or were reckless in not knowing: (i) that the CMS had already denied Triferic's proposal for separate reimbursement by no later than March 27, 2018, of which certain of the Individual Defendants were well aware; and (ii) consequently, Rockwell's estimated reserve figures were understated.

### Improper Statements Made Before CMS's Denial E-mail

109.    On November 8, 2017, Rockwell filed with the SEC its Quarterly Report on Form 10-Q for the third fiscal quarter ended September 30, 2017 (the "Q3 2017 Form 10-Q").  In the Q3 2017 Form 10-Q, defendants created an expectation that Rockwell would soon be successful in its endeavor to obtain separate reimbursement status for Triferic.  In supporting the assertion that Triferic will receive separate reimbursement, the Company pointed to its extensive efforts in working with policy makers "whom have been supportive" and "are encouraging CMS to immediately approve separate reimbursement for Triferic."  In particular, the Q3 2017 Form 10-Q stated:

> We believe that Triferic will receive separate reimbursement as a result of our extensive efforts in working with policy makers. We have had in-depth discussions with high level officials within the current administration, key members of Congress, patient advocacy groups and other stakeholders regarding the merits of Triferic and why this innovative therapy should receive separate reimbursement, all of whom have been supportive of our efforts. We have had meetings with the leadership of the Department of Health and Human Services, the Centers for Medicare and Medicaid Services (CMS) and the Center for Medicare and Medicaid Innovation (CMMI). Upon their guidance, we have submitted a proposal to the Innovation Center at CMS. Among other advantages, the proposal highlights the

improved clinical benefits that Triferic provides to patients, as well as the significant cost savings Triferic delivers to both Medicare and dialysis providers. Additionally, our key supporters in Congress and other influential agencies are encouraging CMS to immediately approve separate reimbursement for Triferic.

110.    On the same day, Rockwell held an earnings conference call with analysts and investors in connection with its third quarter 2017 financial results.  During defendant Chioini's opening remarks, he furthered the expectation that Triferic would obtain separate reimbursement status.  In particular, defendant Chioini stated:

> Now regarding our pursuit of gaining separate reimbursement for Triferic, as you know this is a top priority for us. We have made substantial progress since our last update and we have moved considerably closer to what we anticipate will be a favorable outcome.
>
> Over the last several weeks, we have had productive meetings with the Centers for Medicare and Medicaid Services, CMS, and also with the Center for Medicare and Medicaid Innovation, CMMI. At their request, we prepared and submitted a proposal to the innovation center at CMS.
>
> Among other things, the document highlights the improved clinical benefits that Triferic provides to patients, as well as the significant cost savings Triferic delivers to both Medicare and dialysis providers.

111.    On March 15, 2018, less than two weeks before the CMS denied Triferic for separate reimbursement, Rockwell filed its Annual Report on Form 10-K for the fiscal year ended December 31, 2017 (the "2017 Form 10-K") with the SEC.  Defendants Chioini, Klema, Bagley, Boyd, Cooper, Smith and Ravich signed the 2017 Form 10-K.  In the 2017 Form 10-K, the Company conveyed that separate reimbursement status was anticipated.   In particular, the Company stated:

> While we cannot predict the outcome or timing of the CMS review, *we anticipate that Triferic will receive separate reimbursement* as a result of our extensive efforts in working with policy makers, Congress and stakeholders within the dialysis industry. We have had in-depth discussions with senior officials within the current administration, key members of Congress, patient advocacy groups and other industry stakeholders regarding the merits of Triferic and why this innovative therapy should receive separate reimbursement. Our efforts have received strong support. We have submitted information to CMS that highlights the improved

clinical benefits that Triferic provides to patients, as well as the significant cost savings Triferic delivers to both Medicare and dialysis providers.

112.     The 2017 Form 10-K furthered the incorrect notion that Triferic would soon be granted separate reimbursement status by pointing out that Rockwell had already begun producing Triferic.  Rockwell heightened the expectation of separate reimbursement approval by stating that Triferic's commercial sales will begin in the first half of 2018, assuming CMS approves Triferic. Additionally, the Company's estimated reserve figures reveal that the Individual Defendants were betting on obtaining separate reimbursement status.  Although the Company reserved $3.5 million in the event the CMS denied Triferic, Rockwell already produced $5 million worth of Triferic inventory.  The 2017 Form 10-K stated:

> We have built significant inventory of Triferic in anticipation of receiving separate reimbursement status. However, if we are unable to successfully commercialize Triferic and achieve sufficient sales volumes over the next one to two years, we may have to write off a significant portion of our inventory investment in Triferic, which would have an adverse effect on our business, results of operations and financial position. We have classified $6.0 million of Triferic Active Pharmaceutical Ingredient ("API") as non-current inventory as of December 31, 2017. We have produced sufficient supplies of Triferic API to meet expected prospective demand in 2018 and 2019, assuming we can start commercial sales under separate reimbursement status in the first half of 2018. As of December 31, 2017, we also had $5.0 million of Triferic finished goods inventory that could expire within the next twelve months and against which we have reserved $3.5 million and expensed in 2017 as a result of the uncertainty regarding separate reimbursement for Triferic.

**Improper Statements Made After CMS's Denial E-mail**

113.     On March 27, 2018, the CMS sent an e-mail to Stranne informing that Triferic was denied separate reimbursement status.  This e-mail was promptly forwarded to Rockwell's management, including defendant Chioini.  Defendants failed to file a Current Report on Form 8-

K or otherwise inform the public of this critical development.  Instead, defendants continued to make it seem as though CMS's approval was imminent.

114.    In particular, on April 5, 2018 and May 2, 2018, Rockwell issued press releases stating:

> Rockwell's recent FDA approved drug Triferic is indicated for iron replacement and maintenance of hemoglobin in hemodialysis patients. Triferic delivers iron to patients during their regular dialysis treatment, using dialysate as the delivery mechanism. Triferic has demonstrated that it safely and effectively delivers sufficient iron to the bone marrow and maintains hemoglobin, without increasing iron stores (ferritin). Rockwell intends to market Triferic to hemodialysis patients in the U.S. dialysis market and globally.

115.    These press releases suggested that Triferic would be marketed in the U.S. dialysis market despite the fact that the CMS had denied separate reimbursement status.  Rockwell's fiduciaries knew that Triferic could not be successfully marketed without obtaining separate reimbursement status.

116.    On May 10, 2018, nearly a month and a half after the CMS had denied Triferic for separate reimbursement, Rockwell filed its Quarterly Report on Form 10-Q for the first quarter ended March 31, 2018 (the "Q1 2018 Form 10-Q") with the SEC.  Despite the fact that the CMS had already denied Rockwell's proposal, the Company still claimed that Triferic has the potential to be granted separate reimbursement status.  In supporting this assertion, the Company pointed to conversations with high level officials and members of Congress that resulted in "strong support for separate reimbursement for Triferic."  Rockwell's statements suggest that because of this, and because Triferic's clinical benefits and cost savings have been communicated to the CMS, separate reimbursement status is likely.  The Q1 2018 Form 10-Q stated:

> Although we cannot be certain, we believe that Triferic has the potential to be granted separate reimbursement by CMS as a result of our extensive efforts in working with policy makers to secure separate reimbursement. We have had in-depth discussions with high level officials within the current administration, key

members of Congress, patient advocacy groups and industry stakeholders regarding the merits of Triferic and about why this innovative therapy should receive separate reimbursement. Our efforts have resulted in strong support for separate reimbursement for Triferic. We have submitted information to CMS that highlights the improved clinical benefits that Triferic provides to patients, as well as the significant cost savings Triferic delivers to both Medicare and dialysis providers.

117.    The Q1 2018 Form 10-Q also stated the Company's estimated reserve figures, which failed to account for CMS's denial of separate reimbursement:

We have built and previously invested in significant inventory of Triferic in anticipation of receiving separate reimbursement status. However, if we are unable to successfully commercialize Triferic and achieve sufficient sales volumes over the next one to two years, we will have to write off a significant portion of our inventory investment in Triferic, which would not have a material negative impact on our cash flow but would have a material adverse effect on our results of operations and financial position. *As of March 31, 2018, we had $5.9 million of Triferic finished goods inventory that could expire within the next 12 months and against which we have reserved $4.8 million. In the first quarter of 2018, we reserved an additional $1.3 million (included within our $4.8 million reserve) resulting in a remaining net book value of $1.1 million of Triferic finished goods inventory as of March 31, 2018.*

118.    On the same day, Rockwell held a conference call with analysts and investors to discuss its first quarter of 2018 results.  During his opening remarks, defendant Klema said that he anticipated Triferic would obtain separate reimbursement and repeated the estimated reserve figures, stating:

We have built considerable inventory of Triferic in anticipation of obtaining separate reimbursement. As of March 31, we had $5.9 million of Triferic finished goods inventory, and we reserved $4.8 million of that total $5.9 million. And of that $4.8 million reserved, $1.3 million was reserved in the first quarter, resulting in the remaining net book value of $1.1 million as of the end of March.

119.    Additionally, during the question and answer session of the conference call, defendant Klema presented CMS's approval not as a matter of *if*, but as a matter of *when*, stating:

We've certainly built a lot of inventory in anticipation of reimbursement. And to some extent, it's an insurance policy because we certainly want to have the product available *once we have the green light* to start selling under separate reimbursement.

120.     In his opening remarks during the call, defendant Chioini made it seem as though there was no new information regarding Triferic's separate reimbursement status.  He also assured the public that he would update stockholders and investors once new information was received. In particular, defendant Chioini stated:

> It is difficult for us to estimate the timing for receiving approval on the demonstration project. We are hopeful that we will hear news soon. We continue to have frequent and current communications with key policymakers who are working on behalf of implementing the reimbursement pathway for Triferic or any new innovative therapy entering the renal space. We have not been given a hard date for a response nor can we guarantee the outcome, but **we will update you once we have new information**.

121.     During the question and answer session of the conference call, defendant Chioini further made it seem as though there was no new information regarding Triferic's separate reimbursement status.  Also, defendant Chioini again falsely promised to update stockholders on the status of Rockwell's request for separate reimbursement.  The following exchange took place:

> **David Michael Bouchey -** *IFS Securities, Inc., Research Division – Head of Healthcare Research*
>
> All right. And I know it's impossible to tell what's going on in the minds of the people at CMS and CMMI, but is there a date beyond which you would not wait any longer for CMS to act? Or have you or the Board of Directors even considered that?
>
> **[Defendant] Chioini**
>
> Well, we haven't considered -- well, certainly, we consider it, but we haven't determined a final cutoff date for seeking separate reimbursement. We believe it's in the best interest of the company and the shareholders to move forward and work to get that reimbursement. But we're continually assessing the status of the request and the options on the table. And as we go forward, we'll certainly let shareholders know.

122.     The Q1 2018 Form 10-Q also revealed that the SEC was looking into the Company's statements concerning Triferic's separate reimbursement status.  In particular, the Q1 2018 Form 10-Q stated:

> [W]e received a letter dated April 24, 2018 from the Securities and Exchange Commission requesting certain information generally with respect to the status of CMS's determination of separate reimbursement status for Triferic and our current decision not to actively market and sell Triferic without such separate reimbursement.  We are cooperating with this request.

This disclosure partially reveals the Company's inadequate internal controls, described below.

**Improper Statements Concerning the Effectiveness of the Company's Internal Controls and Certifications Pursuant to SOX**

123.    From November 8, 2017 to May 10, 2018, defendants made statements concerning the effectiveness of Rockwell's internal controls and provided certifications pursuant to SOX. These statements were improper when made because they failed to disclose and misrepresented the following material, adverse facts, which the Individual Defendants knew, consciously disregarded, or were reckless in not knowing: (i) the denial of separate reimbursement of Triferic has significant implications to Rockwell's financial health, including the adequacy of the Company's reserves and future projections; (ii) that the Company was experiencing known but undisclosed deficiencies in its internal controls; and (iii) as a result, Rockwell's representation's concerning the effectiveness of its internal controls and certifications pursuant to SOX were improper.

124.    In Rockwell's Q3 2017 Form 10-Q referenced above, the Company represented that its internal controls over disclosure controls and procedures were effective. The Q3 2017 Form 10-Q was signed by defendants Chioini and Klema, who made certifications pursuant to SOX attesting the adequacy of internal controls over financial reporting. The Q3 2017 Form 10-Q stated:

> As of the end of the period covered by this report, we carried out an evaluation under the supervision and with the participation of our management, including our Chief Executive Officer and Chief Financial Officer, of the effectiveness of the design and operation of our disclosure controls and procedures. Based upon that evaluation, our Chief Executive Officer and Chief Financial Officer concluded that our disclosure controls and procedures were effective, at the reasonable assurance level, as of the end of the period covered by this report.

**Changes in Internal Control over Financial Reporting**

There have been no changes in our internal control over financial reporting (as defined in Rule 13a-15 under the Exchange Act) during the most recently completed fiscal quarter that materially affected, or are reasonably likely to materially affect, our internal control over financial reporting.

125.    Rockwell's 2017 Form 10-K, referenced above, also stated that its internal controls over financial reporting and disclosure controls were effective as of December 31, 2017. The 2017 Form 10-K was signed by defendants Chioini, Klema, Bagley, Boyd, Cooper, Smith, and Ravich, with defendants Chioini signing on behalf of the Company. Rockwell's 2017 Form 10-K contained certifications pursuant to SOX, signed by defendants Chioini and Klema, attesting to the accuracy of the financial reports, the disclosure of all material changes to its internal controls over financial reporting, and the disclosure of all fraud.

126.    The Company's above-referenced Q1 2018 Form 10-Q stated that "[t]here have been no changes in our internal control over financial reporting (as defined in Rule 13a-15 under the Exchange Act) during the most recently completed fiscal quarter that materially affected, or are reasonably likely to materially affect our internal control over financial reporting."  The Q1 2018 Form 10-Q was signed by defendants Chioini and Klema.  The filing also contained SOX certifications signed by defendants Chioini and Klema attesting to the accuracy of the financial reports, the disclosure of all material changes to its internal controls over financial reporting, and the disclosure of all fraud.

## <u>REASONS THE STATEMENTS WERE IMPROPER</u>

127.    These statements referenced above were each improper when made because they failed to disclose and misrepresented the following material, adverse facts, which the Individual Defendants knew, consciously disregarded, or were reckless in not knowing: (i) that the CMS had

already denied Triferic's proposal for separate reimbursement by no later than March 27, 2018, of which Rockwell was well aware; (ii) Rockwell's estimated reserve figures were understated; (iii) the denial of separate reimbursement of Triferic has significant implications to Rockwell's financial health, including the adequacy of the Company's reserves and future projections; (iv) that the Company was experiencing known but undisclosed deficiencies in its internal controls; and (v) as a result, Rockwell's representation's concerning the effectiveness of its internal controls and certifications pursuant to SOX were improper.

## THE INDIVIDUAL DEFENDANTS NEGLIGENTLY MADE MISLEADING STATEMENTS IN ROCKWELL'S 2018 PROXY

128.    Plaintiff's allegations with respect to the misleading statements in the 2018 Proxy are based solely on negligence; they are not based on any allegation of reckless or knowing conduct by or on behalf of these defendants, and they do not allege and do not sound in fraud.  Plaintiff specifically disclaims any allegations of, reliance upon any allegation of, or reference to any allegation of fraud, scienter, or recklessness with regard to these allegations and related claims.

129.    On April 30, 2018, Rockwell issued its 2018 Proxy for the 2018 Annual Meeting of Shareholders, which was held on July 20, 2018.  In the 2018 Proxy, defendants Wolin, Smith, Ravich, Cooper, Colleran, Chioini, Bagley, and Boyd solicited stockholder votes to, among other things, approve the Company's 2018 LTIP.  The 2018 LTIP would replace the Company's 2007 LTIP, which expired on April 11, 2017.  Although the Board solicited stockholder votes to approve an equity plan at the 2017 Annual Meeting of the Shareholders, the stockholders rejected the plan. The defendants claimed that the 2018 LTIP addressed the 2017 plan's shortcomings.

130.    In support of the bid to approve the 2018 LTIP, defendants Wolin, Smith, Ravich, Cooper, Colleran, Chioini, Bagley, and Boyd assured the Company's investors that the plan

addresses stockholders' concerns and incorporates the advice of "independent" consultants.  In particular, the 2018 Proxy stated:

> The Board believes that the 2018 Plan addresses many of the concerns expressed by our shareholders and incorporates the input of our ***independent*** consultants and advisors that specialize in the development of equity plans.

131.    Thus, the 2018 Proxy assured stockholders that the 2018 LTIP's creation was guided by neutral consultants and free from the Board's biases.  In reality, at least one of these consultants, Markson, was not independent.  Markson was conflicted due to an undisclosed prior relationship with defendant Smith.  In addition, defendants Chioini and Klema explained that defendant Smith instructed Markson to manipulate the report forming the basis of the 2018 LTIP so that its compensation and equity incentives were more favorable for directors.  Specifically, under defendant Smith's instruction, Markson increased director pay (including equity) by approximately 50% compared to the director compensation analysis conducted by a neutral consultant.  Additionally, under the 2018 LTIP, director stock options, but not executive or employee stock options, vested in the first year.  This favorable director vesting period deviated from Rockwell's previous equity plans, wherein all vesting occurred at a longer rate of one-third per year, regardless of whether the option's recipient was a director or employee.  Thus, rather than reflect the input of independent consultants, the 2018 LTIP instead reflects the input of the conflicted consultant.

132.    The 2018 Proxy harmed Rockwell by overcompensating directors.  As a result of the misleading statements in the 2018 Proxy, Rockwell's stockholders voted via an uninformed stockholder vote to approve the 2018 LTIP.

## THE TRUTH SLOWLY EMERGES

**First Quarter of 2018**

133.     The truth about Rockwell's lack of internal controls over its disclosures slowly

began to surface on May 10, 2018, when Rockwell filed its Q1 2018 Form 10-Q with the SEC.

The Q1 2018 Form 10-Q disclosed that the SEC was requesting information regarding Triferic's

separate reimbursement status.  Specifically, the Q1 2018 Form 10-Q stated:

> As a follow up to their prior letters dated February 13, 2017 and April 5, 2017, we
> received a letter dated April 24, 2018 from the Securities and Exchange
> Commission requesting certain information generally with respect to the status of
> CMS's determination of separate reimbursement status for Triferic and our current
> decision not to actively market and sell Triferic without such separate
> reimbursement.

134.     On the news of the SEC's investigation, Rockwell's market capitalization plunged

by 6%, or $0.35 per share to close on May 10, 2018 at $5.36 per share, compared to the previous

trading day's closing of $5.71 per share, erasing more than $18 million in market capitalization in

a single day.

**The Events of May 22, 2018 and May 23, 2018**

135.     The truth about Rockwell's defective internal controls further emerged on May 22,

2018, as the Company's fiduciaries issued, or allowed to be issued, conflicting press releases

concerning defendant Chioini's termination.  On May 22, 2018, Rockwell issued a press release

and filed a Current Report on Form 8-K with the SEC announcing that, "the Company's President

and Chief Executive Officer, Robert Chioini, has been terminated from his positions, effective

immediately."   Later on that same day, defendants Chioini and Klema locked themselves in

defendant Chioini's office and filed an unauthorized Current Report on Form 8-K with the SEC,

which was issued the following day.  Defendant Chioini claims to have issued the Form 8-K to

correct materially false and misleading statements in the previous May 22 press release in

fulfillment of his fiduciary duties.   In the Form 8-K, defendant Chioini publicly disputes his termination and implies that it was the other Board members that breached their fiduciary duties, writing:

### Item 8.01 Other Events

A board meeting called for the purpose of discussing a shareholder demand letter and informing the board that the independent non-conflicted directors had hired independent counsel to conduct an internal investigation in response to the demand letter requiring immediate initiation of an investigation of alleged breach of fiduciary duties by various directors and other possible violations of federal securities laws. The directors who are the subjects of the allegations of breaches of fiduciary duty asserted the position that they voted to fire the CEO. As that action was not the purpose of the special meeting, the determination of the non-conflicted independent directors was that the termination was not effective, and based on that and in accordance with the CEO's employment contract the CEO remains.  The CEO through counsel has notified the SEC of the action taken by the directors whose conduct is discussed in the demand letter that gives rise to the investigation, and the CEO continues to serve as the CEO consistent with the terms of his employment agreement. The internal investigation is proceeding under the two non-conflicted independent directors Patrick Bagley and Ronald Boyd.

136.    On May 23, 2018, defendant Chioini followed up his Form 8-K with a press release titled "Rockwell Medical CEO Issues Press Release."  In that press release, defendant Chioini created additional chaos by publicly sharing his account of the circumstances surrounding his termination, writing:

*I submitted a response to The 8K that the Company issued this morning May 23, 2018, that I signed, Acc-no: 0001104659-18-035192, is true and accurate and represents correctly what has transpired. We have made appropriate disclosures to the Company's auditors, and we are following proper governance measures. As CEO, I have instructed the CFO to remain in his duties.*

*As the 8K states, on May 22, 2018, I called an emergency Board meeting for the purpose of discussing a shareholder demand letter requesting an independent investigation and alleging breaches of fiduciary duties and other possible violations of securities and other laws by various directors. The special meeting was called for the sole purpose of discussing various allegations of misconduct by directors and inform the full Board of steps the non-conflicted independent directors have taken to retain counsel and initiate an independent investigation. The call was convened and the directors whose conduct was the subject of the allegations of breaches of fiduciary duties, with securities counsel present, asserted*

*the position that they voted to fire the CEO. As that action was not the purpose of the special meeting, the termination of the CEO, in the opinion of the non-conflicted independent directors, was not effective. The CEO, through counsel, has notified the SEC of the action taken by the directors whose conduct is discussed in the demand letter that gave rise to the investigation. The CEO continues to serve as the CEO consistent with the terms of his employment agreement. The internal investigation is proceeding under direction of the two non-conflicted independent directors Patrick Bagley and Ronald Boyd who have retained qualified and highly experienced counsel to conduct the investigation.*

*The Chairman of Board issued a second conflicting 8K this morning. Therein is referenced a Board meeting in which it is asserted that the CFO, Thomas Klema, was terminated. I have no information to suggest the governance requirements to call such a meeting were followed. The same 8K states that the Board created a Special Transition Committee comprised of Benjamin Wolin, Lisa Colleran, and John Cooper, to provide board-level oversight of the Company's strategic direction and day-to-day operations during the Company's transition. I have no information to suggest that the governance requirements for the creation of such a committee were followed.*

*I am informed that the independent investigation has commenced. Our expectation is that all directors will cooperate fully with the investigation. I remain committed fully to acting in the best interests of all shareholders.*

137.    On May 23, as a result of these conflicting press releases, NASDAQ took the unusual measure of halting trading in Rockwell's stock for two days, stating:

NEW YORK, May 23, 2018 (GLOBE NEWSWIRE) -- The Nasdaq Stock Market (Nasdaq:NDAQ) announced that the trading halt status in Rockwell Medical, Inc. (Nasdaq:RMTI) was changed to "additional information requested" from the company. Trading in the company's stock had been halted today, May 23, 2018, at 09:23:14 Eastern Time for "news pending" at a last sale price of $5.94.

Trading will remain halted until Rockwell Medical, Inc. has fully satisfied Nasdaq's request for additional information.

138.    These conflicting press releases and the announcement that NASDAQ was halting Rockwell's trading exposed the chaos surrounding Rockwell's management and revealed a total absence of controls over Rockwell's reporting.

139.    On this news, and after Rockwell's trading resumed on May 25, 2018, market capitalization plunged by 11%, or $0.67 per share over five consecutive trading days to close on

June 1, 2018 at $5.27 per share, compared to closing on May 24, 2018 at $5.94 per share, erasing $34 million of market capitalization.

**June 27, 2018 Form 8-K**

140.    On June 27, 2018, three months after Rockwell received the denial e-mail from the CMS, the truth about Triferic's separate reimbursement status emerged as the Company filed with the SEC a Current Report on Form 8-K announcing the resignation of its auditor, Plante & Moran, effective immediately.  The Form 8-K attached a letter from Plante & Moran dated June 22, 2018, stating that the auditor felt Rockwell hid CMS's denial e-mail, which Plante & Moran included as an attachment.  In the letter, Plante & Moran wrote:

> Dear Audit Committee Members:
>
> We have been made aware of the attached e-mail received by Rockwell Medical, Inc. (Rockwell) on March 27, 2018 in connection with its ongoing pursuit of Triferic special reimbursement status. This e-mail was not disclosed to us in the course of our review procedures related to the financial statements for the quarter ended March 31, 2018 (Q1) included in Rockwell's form 10Q filed on May 15, 2018. ***This e-mail and its contents are inconsistent with representations made to us by Rockwell, orally and in writing, in connection with our review procedures***. Had we been made aware of this e-mail, we would have informed you of the following matters:
>
> ***Uncorrected Misstatements***
>
> Management's estimate of reserves for slow-moving and obsolete Triferic inventory is determined based on a weighted average probability model that considers anticipated product launch dates, current sales projections, and product expiration dates. Rockwell management represented that the factors used in its determination of the Q1 reflected the best information and estimates available as of the 10Q filing date. In estimating these reserves for Q1, Rockwell assigned a 50 percent probability weighting to outcomes dependent on near-term approval of Triferic special reimbursement status. Elimination of those outcomes from the Q1 reserve analysis model would have suggested additional reserves recognizable in Q1 totally approximately $400,000.

### Internal Control Matters

The above-referenced e-mail provides significant evidence regarding Rockwell's ongoing pursuit of Triferic special reimbursement status that was not given consideration in determining inventory reserves, classification and disclosures. This failure to consider all known facts and evidence regarding these matters is a deficiency in operation and effectiveness of Rockwell's financial reporting and disclosure controls that we consider to be a material weakness in those controls.

### Inconsistencies in 10Q Filing

We call to your attention to the following matters in Rockwell's form 10Q filing for the quarter ended March 31, 2018, that we believe to be inconsistent with the facts in existence at the time of filing:

- Certification Pursuant to Rule 13a-14(a) – Robert L. Chioini
- Certification Pursuant to Rule 13a-14(a) – Thomas E. Klema
- Note 2 to the Q1 financial statements, Basis of Presentation (specifically, 2nd paragraph)
- Item 4. Controls and Procedures (specifically, 2nd and 3rd paragraphs)

In addition, had this e-mail been disclosed to us, our communications to you resulting from our pre-filing review of the Q1 10Q would have included our view that the disclosures in the Overview section of Item 2 regarding Triferic should have been clearer and more transparent regarding the status of Rockwell's request for separate reimbursement with CMS and the prospects for reversal of CMS's decisions.

141.    The Form 8-K containing Plante & Moran's letter revealed that Rockwell had been denied separate reimbursement status, and also revealed that Rockwell's fiduciaries had been actively concealing such denial.  The letter also pointed out that Rockwell's estimated reserve figures failed to take into account the CMS's denial, resulting in Rockwell misstating its reserves by at least $400,000 in its Q1 2018 Form 10-Q.  Plante & Moran pointed out that this evidences a material weakness in Rockwell's internal controls over financial reporting, which Rockwell failed to disclose.  On this news, Rockwell's market capitalization plunged more than 16%, or $0.85 per share, on June 28, 2018, to close at $4.41 per share compared to the previous trading day's closing of $5.26 per share, erasing more than $44 million in market capitalization.

142. Altogether, the Individual Defendants' improper statements caused Rockwell's stock to plunge more than 33%, or $2.24 per share on June 27, 2018, to close at $4.52 per share compared to the close of $6.76 per share on March 14, 2018, erasing more than $115 million in market capitalization in less than four months.

## DAMAGES TO ROCKWELL

143. As a result of the Individual Defendants' improprieties, Rockwell disseminated improper, public statements concerning Triferic's separate reimbursement status and the effectiveness of the Company's internal controls. These improper statements have devastated Rockwell's credibility as reflected by the Company's $115 million, or 33%, market capitalization loss.

144. Rockwell still has not recovered from the Individual Defendants' wrongful conduct described herein, as evidenced by the 63%, or $221 million erasure in its market capitalization from March 14, 2018 to December 31, 2018.

145. Further resulting from the Individual Defendants' conduct, Rockwell has suffered and continues to suffer from an instable Board and management. Without stable management, Rockwell is unable to successfully market Triferic, a potentially life-saving drug.

146. Rockwell's performance issues also damaged its reputation within the business community and in the capital markets. In addition to price, Rockwell's current and potential customers consider a company's trustworthiness, stability, and ability to evaluate known risks. Investors are less likely to invest in companies that disseminate improper statements and fail to comply with their own internal protocols and external regulations. Rockwell's ability to raise equity capital or debt on favorable terms in the future is now impaired. In addition, the Company stands to incur higher marginal costs of capital and debt because the improper statements and

misleading projections disseminated by the Individual Defendants have materially increased the perceived risks of investing in and lending money to the Company.

147.    Further, as a direct and proximate result of the Individual Defendants' actions, Rockwell has expended, and will continue to expend, significant sums of money.   Such expenditures include, but are not limited to:

(a)    costs incurred from compensation and benefits paid to the defendants who have breached their duties to Rockwell;

(b)    costs incurred from overcompensating the Director Defendants based on the manipulated 2018 LTIP;

(c)    costs incurred from the Richmond/Rockwell Lawsuit, including the First and Second Settlement Agreements;

(d)    costs incurred from defending and paying the Whistleblower Settlement Agreement; and

(e)    costs incurred from defending and paying any settlement in the Securities Class Action for violations of federal securities laws;

(f)    costs incurred from NASDAQ halting Rockwell's trading;

(g)    costs incurred from remedying Plante & Moran's resignation, including hiring a new public auditor;

(h)    costs incurred from restating past financial statements; and

(i)    costs incurred in complying with the SEC investigation, including any fines or penalties resulting therefrom.

## DERIVATIVE AND DEMAND IGNORED ALLEGATIONS

148.    Plaintiff brings this action derivatively in the right and for the benefit of Rockwell to redress injuries suffered, and to be suffered, by Rockwell as a direct result of breaches of fiduciary duty, waste of corporate assets, and unjust enrichment, as well as the aiding and abetting thereof, by the Individual Defendants.  Rockwell is named as a nominal defendant solely in a derivative capacity.  This is not a collusive action to confer jurisdiction on this Court that it would not otherwise have.

149.    Plaintiff will adequately and fairly represent the interests of Rockwell in enforcing and prosecuting its rights.

150.    Plaintiff was a stockholder of Rockwell at the time of the wrongdoing complained of, has continuously been a stockholder since that time, and is a current Rockwell stockholder.

151.    In accordance with Michigan law, on January 22, 2019, plaintiff sent his Demand to the Board to investigate, address, remedy, and commence proceedings against certain of the Company's current and former officers and directors for mismanagement, breaches of fiduciary duties, and violations of federal law.  A true and correct copy of the Demand is attached hereto as Exhibit A.  The Board received the Demand on January 29, 2019.  Proof of the Demand's delivery is attached hereto as Exhibit B.

152.    To date, the Board has refused to respond to the Demand and, upon information and belief, refused to take any action demanded.  Over ninety days have now passed since plaintiff made his initial Demand, fulfilling the time requirement before bringing a derivative action under Michigan law.  Accordingly, it is proper for plaintiff to pursue this action now.

153.    Plaintiff has not made any demand on the other stockholders of Rockwell to institute this action since such a demand would be a futile and useless act for at least the following

reasons:

      (a)     Rockwell is a publicly held company with over fifty-seven million shares outstanding and thousands of stockholders as of March 13, 2019;

      (b)     making demand on such a large number of stockholders would be impossible for plaintiff, who has no way of finding out the names, addresses, or phone numbers of stockholders; and

      (c)     making demand on all stockholders would force plaintiff to incur excessive expenses, assuming all stockholders could be individually identified.

## COUNT I

### Against the Director Defendants for Violation of Section 14(a) of the Exchange Act

154.    Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

155.    The section 14(a) Exchange Act claims alleged herein are based solely on negligence.  They are not based on any allegation of reckless or knowing conduct by or on behalf of the Director Defendants.  The section 14(a) Exchange Act claims detained herein do not allege and do not sound in fraud.  Plaintiff specifically disclaims any allegation of, reliance upon any allegation of, or reference to any allegation of fraud, scienter, or recklessness with regard to the nonfraud claims.

156.    The Director Defendants negligently issued, caused to be issued, and participated in the issuance of materially misleading written statements to stockholders which were contained in the 2018 Proxy.  In the 2018 Proxy, the Board solicited stockholder votes to approve the Company's 2018 LTIP.  The 2018 Proxy, however, misrepresented and failed to disclose that the report forming the basis of the 2018 LTIP was manipulated by a conflicted outside consultant.  By

reasons of the conduct alleged herein, the Director Defendants violated section 14(a) of the Exchange Act.  As a direct and proximate result of these defendants' wrongful conduct, Rockwell misled and deceived its stockholders by making misleading statements that were essential links in stockholders heeding Rockwell's recommendation to approve the 2018 LTIP.

157.    The misleading information contained in the 2018 Proxy was material to Rockwell's stockholders in determining whether or not to approve the 2018 LTIP, as indicated by the stockholders' rejection of the previous year's plan, among other things.  The proxy solicitation process in connection with the 2018 Proxy was an essential link in the approval of the 2018 LTIP.

158.    Plaintiff, on behalf of Rockwell, thereby seeks relief for damages inflicted upon the Company based upon the misleading 2018 Proxy in connection with the improper approval of the 2018 LTIP.

## COUNT II

### Against the Individual Defendants for Breach of Fiduciary Duty

159.    Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

160.    The Individual Defendants owed and owe Rockwell fiduciary obligations.  By reason of their fiduciary relationships, the Individual Defendants owed and owe Rockwell the highest obligation of good faith, fair dealing, loyalty, and due care.

161.    The Individual Defendants and each of them, violated and breached their fiduciary duties of candor, good faith, and loyalty.  More specifically, the Individual Defendants violated their duty of good faith by creating a culture of lawlessness within Rockwell, and/or consciously failing to prevent the Company from engaging in the unlawful acts complained of herein.

162.    The Officer Defendants either knew, were reckless, or were grossly negligent in disregarding the illegal activity of such substantial magnitude and duration.   The Officer Defendants either knew, were reckless, or were grossly negligent in not knowing: (i) that the CMS had already denied Triferic's proposal for separate reimbursement by no later than March 27, 2018, of which Rockwell was well aware; (ii) Rockwell's estimated reserve figures were understated; (iii) the denial of separate reimbursement of Triferic has significant implications to Rockwell's financial health, including the adequacy of the Company's reserves and future projections; (iv) that the Company was experiencing known but undisclosed deficiencies in its internal controls; and (v) as a result, Rockwell's representations concerning the effectiveness of its internal controls and certifications pursuant to SOX were improper.   As a result, the Officer Defendants' public statements about Rockwell's business were misleading.   Accordingly, the Officer Defendants breached their duty of care and loyalty to the Company.

163.    The Director Defendants, as directors of the Company, owed Rockwell the highest duty of loyalty.   These defendants breached their duty of loyalty by recklessly permitting the improper activity detailed herein.   The Director Defendants knew or were reckless in not knowing: (i) that the CMS had already denied Triferic's proposal for separate reimbursement by no later than March 27, 2018, of which Rockwell was well aware; (ii) Rockwell's estimated reserve figures were understated; (iii) the denial of separate reimbursement of Triferic has significant implications to Rockwell's financial health, including the adequacy of the Company's reserves and future projections; (iv) that the Company was experiencing known but undisclosed deficiencies in its internal controls; and (v) as a result, Rockwell's representations concerning the effectiveness of its internal controls and certifications pursuant to SOX were improper.   As a result, the Director

Defendants' public statements about Rockwell's business were misleading.  Accordingly, these defendants breached their duty of loyalty to the Company.

164.     The Audit Committee Defendants breached their fiduciary duty of loyalty by approving the statements described herein which were made during their tenure on the Audit Committee, which they knew or were reckless in not knowing contained improper statements and omissions.  The Audit Committee Defendants completely and utterly failed in their duty of oversight, and failed in their duty to appropriately review financial results, as required by the Audit Committee Charter in effect at the time.

165.     The Compensation Committee Defendants breached their fiduciary duties by approving excessive compensation and failing to report to the full Board the minutes of their meetings.

166.     The Governance and Nominating Committee Defendants breached their fiduciary duties by recommending unqualified candidates to the Board, by failing to conduct appropriate inquiries into the candidates' background, and by failing to consider and disclose conflicts of interest.

167.     Defendants Klema, Bagley, and Boyd entrenched themselves in order to secure continued director and officer positions and in order to secure lucrative compensation.  Thus, defendants Klema, Bagley, and Boyd breached their fiduciary duty of loyalty.

168.     Defendants Chioini, Klema, Bagley, and Boyd granted themselves and one another unreasonable executive compensation at the expense of Rockwell and its stockholders, including, but not limited to, improper equity awards described herein.  Accordingly, defendants Chioini, Klema, Bagley, and Boyd violated their duties of care and loyalty.

169.     In further breach of their duties, defendants Chioini, Klema, Bagley, and Boyd

failed to disclose to other Board members communications from relevant governmental agencies regarding the status of Triferic's separate reimbursement status or transition pricing.  As a result, defendants Chioini, Klema, Bagley, and Boyd violated their duties of good faith, care, and loyalty.

170.    Defendants Wolin, Smith, Ravich, Cooper, and Colleran breached their fiduciary duty of loyalty by granting themselves excessive compensation based on a manipulated report. These defendants either knew or were reckless in not knowing that the report was manipulated.

171.    As a direct and proximate result of the Individual Defendants' breaches of their fiduciary obligations, Rockwell has sustained significant damages, as alleged herein.  As a result of the misconduct alleged herein, these defendants are liable to the Company.

172.    Plaintiff, on behalf of Rockwell, has no adequate remedy at law.

## COUNT III

### Against the Individual Defendants for Waste of Corporate Assets

173.    Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

174.    As a result of the Individual Defendants' failure to implement adequate controls to ensure that the Company's SEC filings were accurate, Rockwell is subject to the Securities Class Action.  The Individual Defendants have caused Rockwell to waste its assets and incur substantial costs by defending itself in the ongoing action, in addition to any ensuing costs from a potential settlement or adverse judgement.

175.    As a result of the Individual Defendants forcing Rockwell to enter into the Whistleblower Settlement Agreement, the Individual Defendants have caused Rockwell to waste its assets and incur substantial costs.  In particular, Rockwell was forced to pay $1.5 million to defendants Chioini, Klema, Bagley, and Boyd, plus an additional $30,000 to defendant Boyd.

176.    As a result of the Individual Defendants' failure to conduct proper supervision, the Individual Defendants have caused Rockwell to waste its assets by paying improper compensation and bonuses to certain of its executive officers and directors that breached their fiduciary duty.

177.    As a result of the Individual Defendants' failure to disclose the e-mail from the CMS to the public, to Plante & Moran, and to certain other Board members, the Individual Defendants have caused Rockwell to waste its assets and incur substantial costs.  In particular, the Company incurred costs that were required to find another auditor.  Additionally, the Company may be required to write off amounts of Triferic inventory, which may have been avoided had the status of Triferic's separate reimbursement been shared with other Board members.

178.    As a result of the waste of corporate assets, the Individual Defendants are liable to the Company.

179.    Plaintiff, on behalf of Rockwell, has no adequate remedy at law.

## COUNT IV

### Against the Individual Defendants for Unjust Enrichment

180.    Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

181.    By their wrongful acts and omissions, the Individual Defendants were unjustly enriched at the expense of and to the detriment of Rockwell.  The Individual Defendants were unjustly enriched as a result of the compensation and director remuneration they received while breaching fiduciary duties owed to Rockwell.

182.    Plaintiff, as a stockholder and representative of Rockwell, seeks restitution from these defendants, and each of them, and seeks an order of this Court disgorging all profits, benefits,

and other compensation obtained by these defendants, and each of them, from their wrongful conduct and fiduciary breaches.

183.    Plaintiff, on behalf of Rockwell, has no adequate remedy at law.

## **PRAYER FOR RELIEF**

WHEREFORE, plaintiff, on behalf of Rockwell, demands judgment as follows:

A.    Against all of the defendants and in favor of the Company for the amount of damages sustained by the Company as a result of the defendants' breaches of fiduciary duties, waste of corporate assets, and unjust enrichment;

B.    Directing Rockwell to take all necessary actions to reform and improve its corporate governance and internal procedures to comply with applicable laws and to protect Rockwell and its stockholders from a repeat of the damaging events described herein, including, but not limited to, putting forward for stockholder vote, resolutions for amendments to the Company's Bylaws or Articles of Incorporation and taking such other action as may be necessary to place before stockholders for a vote of the following corporate governance policies:

1.    a proposal to strengthen the Board's supervision of operations and develop and implement procedures for greater stockholder input into the policies and guidelines of the Board;

2.    a provision to permit the stockholders of Rockwell to nominate at least three candidates for election to the Board;

3.    a proposal to strengthen the Company's determination and approval of executive compensation;

4.    a proposal to revise the Company's director compensation so that the Board's compensation is commensurate with directors at truly comparable peer firms;

5.        a proposal to revise the 2018 LTIP such that: (i) the advice of a neutral, nonconflicted consultant is incorporated and any equity granted to the Board in 2018 in conjunction with its approval is rescinded;

6.        a proposal to strengthen the Company's controls over its reporting of material events to the Board;

7.        a proposal to strengthen Rockwell's oversight of its disclosure procedures; and

8.        a proposal to strengthen the Company's controls over financial reporting.

C.        Extraordinary equitable and/or injunctive relief as permitted by law, equity, and state statutory provisions sued hereunder, including attaching, impounding, imposing a constructive trust on, or otherwise restricting the proceeds of defendants' trading activities or their other assets so as to assure that plaintiff on behalf of Rockwell has an effective remedy;

D.        Awarding to Rockwell restitution from defendants, and each of them, and ordering disgorgement of all profits, benefits, and other compensation obtained by the defendants;

E.        Awarding to plaintiff the costs and disbursements of the action, including reasonable attorneys' fees, accountants' and experts' fees, costs, and expenses; and

F.        Granting such other and further relief as the Court deems just and proper.

## JURY DEMAND

Plaintiff demands a trial by jury.

Dated: May 10, 2019

LAW OFFICE OF THOMAS G. AMON

THOMAS G. AMON

733 3rd Avenue, 15th Floor
New York, NY 10017
Telephone: (212) 810-2430
E-mail: tamon@amonlaw.com

ROBBINS ARROYO LLP
BRIAN J. ROBBINS
CRAIG W. SMITH
SHANE P. SANDERS
5040 Shoreham Place
San Diego, CA 92122
Telephone: (619) 525-3990
Facsimile: (619) 525-3991
E-mail: brobbins@robbinsarroyo.com
        csmith@robbinsarroyo.com
        ssanders@robbinsarroyo.com

RM LAW, P.C.
Richard A. Maniskas
1055 Westlakes Dr., Ste. 300
Berwyn, PA 19312
Telephone: (484) 324-6800
Facsimile: (484) 631-1305
E-mail: rmaniskas@rmclasslaw.com

Attorneys for Plaintiff

1351470

<u>ROCKWELL MEDICAL, INC. VERIFICATION</u>

I, John Post, hereby declare as follows:

I am the plaintiff in the within entitled action.  I have read the Verified Stockholder Derivative Complaint for Violation of Securities Law, Breach of Fiduciary Duty, Waste of Corporate Assets, and Unjust Enrichment.  Based upon discussions with and reliance upon my counsel, and as to those facts of which I have personal knowledge, the Complaint is true and correct to the best of my knowledge, information, and belief.

I declare under penalty of perjury that the foregoing is true and correct.

Dated: 5/9/19

JOHN POST